In the Matter of John McCandish
KING, Debtor.

No. 71 B 1630.

United States District Court,
D. Colorado.

Jan. 28, 1975.

Stanton D. Rosenbaum and Barry J. Goldstein of Isaacson, Rosenbaum, Spiegleman & Friedman, P. C., Denver, Colo., for debtor John McCandish King.

Thomas H. Boerschinger, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., John D. Moats, Atty., Office of Chief Counsel, I.R.S., Denver, Colo., and Carolyn J. McNeill, Asst. U.S. Atty., Denver, Colo., for United States.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON TAX ISSUES, PHASE ONE AND PHASE TWO

MATSCH, District Judge.

In the course of this proceeding for an arrangement of debts under Chapter XI of the Bankruptcy Act, the debtor, John M. King, applied for a determination of the amount and validity of taxes assessed against him and for tax liens filed pursuant to those assessments. Jurisdiction over these questions was previously determined by a memorandum opinion and order entered on August 15, 1972.

As a result of agreed pre-trial orders, the issues have been divided into three phases for trial. Phase One was heard from March 4, 1974 through March 13, 1974 and Phase Two was heard from July 15, 1974 through July 18, 1974. Counsel have agreed that these two phases should be determined before proceeding with the trial of Phase Three.

## FACTUAL CONTEXT FOR PHASE ONE

To understand the specific issues involved in this Phase One litigation, it is first necessary to set forth certain facts establishing the context in which these questions arose.

John M. King entered the oil business as a young man forming Fox-King Oil Company in 1955. Two years later, he joined with Mr. Stevenson in forming King-Stevenson Oil Company for certain drilling operations which proved to be quite successful. In 1960, Mr. King and Mr. Stevenson formed King-Stevenson Gas and Oil Company, which carried on an oil and gas exploration business in the Midwest and Rocky Moun-

tain Region. These two terminated their business relationship and Mr. King then formed King Resources Company to engage in the same type of business. That company went public in 1967 with the issuance of stock and convertible debentures through Dempsey-Tegler and Company as the underwriter.

With John M. King as chairman of its board of directors, King Resources Company experienced dramatic growth between 1967 and 1970. The scope of its exploration activity expanded with the creation of two new companies to raise public investment funds for such activities through the sale of interests in a series of limited partnerships. Imperial-American Resources Fund, Inc. was created as a Delaware corporation to be the sole general partner in a series of limited partnerships which acquired the beneficial ownership of proven and semi-proven oil and gas properties. Royal Resources Exploration, Inc. was organized as a Delaware corporation to be the general partner in a series of limited partnerships which acquired the beneficial ownership of wildcat oil and gas properties. King Resources Company did much of the actual drilling of exploratory and development wells on these properties.

All of the stock of Imperial-American Resources Fund, Inc. was issued to Imperial-American Management Company, a Delaware corporation, which held title to the Fund properties as the nominee for the limited partnerships and which managed the affairs of the partnerships under contracts providing for receipt by the Management Company of a 25% "net operating profits interest" in each oil and gas lease or other property of such partnerships. All of the stock of Imperial-American Management Company was issued to John M. King, to his wife, Carylyn B. King and to trusts for their children, which trusts are hereinafter described and designated collectively as Trusts No. 1.

All of the stock of Royal Resources Exploration, Inc. was issued to Royal Resources Company, a Delaware corporation owned by Mr. and Mrs. King and Trusts No.

1. The relationship between Royal Resources Company and the Royal Resources partnerships was the same as the relationship between Imperial-American Management Company and the Imperial-American partnerships just described.

In November, 1968, Mr. and Mrs. King and Trusts No. 1 exchanged their stock in Imperial-American Management Company and Royal Resources Exploration, Inc. for stock in a new corporation called The Colorado Corporation. In addition to being a holding company, The Colorado Corporation also engaged in business of the acquisition, sale and development of oil, gas and mineral properties. It also owned the stock of The Denver Corporation which was the broker-dealer for the sale of participation interests in the Royal and Imperial-American limited partnerships as securities offered under registration with the Securities and Exchange Commission.

John M. King personally participated in the investments made by the Royal and Imperial partnerships through a series of joint venture funds parallel to but separate from the limited partnerships.

While each of the Imperial companies, the Royal companies and King Resources Company, as well as The Colorado Corporation, had separate officers and directors, John M. King was active in the management of the entire complex of corporations, particularly in the area of financing. Additionally, an elaborate accounting system was organized and operated for all of these companies through a computer system. The corporate complex engaged in vigorous and aggressive drilling operations in many parts of the world and employed a large number of persons.

The business of the King company complex was greatly influenced by the personality and life style of John M. King. He pursued methods and manners which made him very visible within the industry and to the investing public and he operated flamboyantly, aggressively and with bullish enthusiasm. In his testimony Mr. King estimated that during these years he was travelling constantly throughout the world

and that he was able to be in the central offices of the companies in Denver, Colorado, only about 80 days out of the year. He also said that four secretaries and other support personnel were responsible for scheduling his time and travel. Because of the scope of his personal involvement in these complex activities, he relied upon many other persons to implement the broad policies adopted and he freely delegated authority to act for him and for the companies.

The necessary accounting and legal documentation of these activities was always well behind the occurrence of the events. Accordingly, the lawyers and accountants were routinely and consistently preparing papers "as of" a date earlier than their execution. The preparation of such documents was customarily based upon information given to those lawyers and accountants by Mr. King either directly or indirectly.

During the same years that the King companies were experiencing phenomenal growth, another complex of companies underwent rapid expansion. They constituted what shall here be called the IOS Group and engaged in what may be characterized as the offshore mutual fund business obtaining great quantities of money from investments in mutual funds by persons throughout the world. They designed their business to avoid governmental regulation by staying out of countries with laws and agencies such as the securities laws of the United States. The visible leader of the IOS Group was Bernard Cornfeld and Mr. Edward Cowett appeared to be the next most important official for these companies.

Through these mutual funds, IOS controlled great amounts of cash for which it was seeking investment opportunities. The King companies provided those opportunities and by 1970 IOS had become their largest customer for the sale of oil, gas and mineral projects.

Cracks opened in the IOS structure in the spring of 1970. There was an apparent division among those in control. At the same time, there was a collapsing stock market which not only restricted new investment in the mutual funds, but, which also generated a rush of redemptions by the investors.

Mr. King had caused King Resources Company to complete a fairly extensive computer analysis of IOS management and Mr. Cornfeld invited John M. King to attempt to form a consortium to acquire control of IOS. Those efforts are described in the factual context for Phase Two.

Upon the failure of these attempts, John M. King and the companies involved in the King complex developed severe financial difficulties which resulted in various bankruptcy proceedings. An involuntary bankruptcy petition was filed against The Colorado Corporation on April 20, 1971 and after a long contest it was adjudicated bankrupt on September 6, 1974.

John M. King filed his petition under Chapter XI on June 1, 1971. An involuntary Chapter X petition was filed for King Resources Company on August 14, 1971 and Imperial-American Resources Fund, Inc. filed for reorganization under that chapter on February 25, 1972. All of these proceedings are still pending in this district.

The assessments which create the issues to be decided in this proceeding are jeopardy assessments made on May 1, 1971 and May 31, 1972 for a total of approximately $18,000,000.00. Counsel have agreed that the Court should determine the issues without making any computations of tax, reserving that aspect of the matter for further proceedings.

### ISSUE NO. ONE: Gift Tax on Transfer of The Colorado Corporation stock to Trusts No. 2, May, 1970

A gift tax was assessed against John M. King upon the assertion that in May, 1970, he transferred common stock of The Colorado Corporation to domestic trusts for the benefit of his four children for less than an adequate and full consideration. The amount of the tax is contended to be the difference between its then market value and the value of the consideration received.

John and Carylyn King have four children: John M. King, IV, Carylyn Ann King, Sally Ann King and Mark M. King. In 1967 Mr. King established trusts for each of these children with his friend and attorney, Mr. Timothy Lowry, as trustee. Those trusts, which are referred to collectively as Trusts No. 1 throughout this litigation, were designed to exist for the full period permitted by the rule against perpetuities and to benefit not only the children, but the grandchildren and great-grandchildren as well. Accordingly, distribution to the four King children was restricted. Mr. James Bye, a Denver attorney experienced in such matters, prepared the documents creating Trusts No. 1 in 1967 and he was consulted from time to time by John M. King in the area of personal tax planning. During the course of a meeting between them in October, 1969, Mr. Bye was told by Mr. King that he had sold stock of The Colorado Corporation to Timothy Lowry as trustee of a newly created trust for the King children, in an oral transaction at the beginning of 1969, and Mr. Bye was asked to draft the documents for that sale. After obtaining confirmation from Mr. Lowry that such a transaction had taken place, Mr. Bye drafted several documents, dating them "as of January 1, 1969".

Four of these documents (Exhibits A, B, C and TT) are identical letter agreements between John M. King and Timothy G. Lowry, trustee, for each of four trusts designated as Sally Ann King Trust No. 2, John M. King, IV Trust No. 2, Carylyn Ann King Trust No. 2 and Mark M. King Trust No. 2. For convenience, these trusts are hereinafter collectively called Trusts No. 2. Each agreement shows the date of January 1, 1969 and each is for the sale of 400 shares of the stock of The Colorado Corporation with the purchase price stated to be an amount equal to the book value of the assets of that company, excepting the stock in Imperial and American, which price is made payable in eight equal annual installments commencing January 1, 1973, with interest. All of the agreements provide for retention of title to such stock by Mr. King as security for payment of the purchase price and they all include the following language:

". . . However, if the fair market value of The Colorado Corporation stock as of the date of this letter is ever determined by the Internal Revenue Service to be greater or less than the fair market value determined in the manner described above, the purchase price shall be adjusted to the fair market value determined by the Internal Revenue Service".

Attached to each letter agreement is a single page "Declaration of Trust" signed by Timothy G. Lowry, declaring that he holds all rights under each agreement as trustee for each of the respective No. 2 Trusts and that he will execute a formal trust agreement which will set forth the terms and conditions of the trust.

Exhibits H through K are the formal trust agreements for these four trusts. These documents were prepared by Mr. Bye after his October, 1969 discussions with Mr. King and with Mr. Lowry and each document recites as follows:

"THIS AGREEMENT, made as of this 1st day of January, 1969, between Timothy G. Lowry of Chicago, Illinois, (hereinafter called the "Grantor"), and Carylyn B. King of Arapahoe County, Colorado, Timothy G. Lowry of Chicago, Illinois, A. Rowland Boucher of Denver, Colorado, and Edward M. Cowett of Geneva, Switzerland, (hereinafter called the "Trustees")."

The property granted in each trust agreement is described as:

"All rights and obligations under an agreement dated as of January 1, 1969, between John M. King and Timothy G. Lowry, Trustee, for the purchase of 400 shares of the stock of The Colorado Corporation."

As previously noted, The Colorado Corporation was organized in November, 1968 to hold the stock of Royal Resources Corporation, Imperial-American Management Corporation, and The Denver Corporation. It acquired that stock from John M. King and from each of the Trusts No. 1 in exchange

for its shares. A total of 10,000 shares was issued by The Colorado Corporation with 2,000 going to John King and 2,000 to each of the four trusts of June 30, 1967. (Trusts No. 1). The 1600 shares subject to these agreements dated January 1, 1969 with the Trusts No. 2 were from that initial issue of 2,000 shares to John M. King.

The formula used for these agreements with Lowry as trustee was the same as that which had been used for a qualified stock option plan of The Colorado Corporation. Using that formula the stock was valued at $1250.00 per share and the four trusts executed notes for a total of $2,000,000.00. Later, there was a 1,000 for 1 split of The Colorado Corporation stock so the net result was the transfer of 1,600,000 shares at $1.25 per share.

The parties have agreed that this Court will not now attempt to value this stock upon the present record. Part of this same stock was the subject of a purchase agreement dated "as of May 25, 1970" between John King as buyer and the Trusts No. 2 as sellers with a price of $5.00 per share as will later be described in the discussion relating to the annuity agreement issues.

Mr. Bye testified that he inserted the provision for redetermination of the purchase price because there was an uncertainty about the value of stock in The Colorado Corporation because it was closely held and because there had been a few sales of it.

### CONCLUSIONS ON THIS ISSUE

The questions presented by these facts are: (1) when did Trusts No. 2 come into existence? (2) when did the transfer of stock to these trusts take place? (3) was there a transfer for adequate consideration? (4) what is the effect of the provision for redetermination of the purchase price for this stock?

■ The time of creation of the trusts must be considered because there can be no transfer to a trust which does not exist as a legal entity. Among the elements essential for creation of a trust are the settlor's intent to create the trust, an identifiable

trust res, a trustee and identifiable beneficiaries. *G. Bogert, Trusts and Trustees* § 41 et seq. (2d ed.). A secret intent is not adequate. The settlor must make some objective manifestation of his intent to create the trust. *Scott, Abridgment of the Law of Trusts*, § 23 at 66 (1960). The confusion inherent in reliance upon a mere verbal declaration of trust is compounded here by the fact that the trust res is the stock sale agreement which is claimed to have been made orally and at the same time as the creation of the trust. Additionally, the only persons participating in the transaction in January, 1969 have an attorney and client relationship as well as a close personal friendship.

■ The first manifestation of the intent to create a trust shown by the evidence was the affirmation made to Mr. Bye by Mr. Lowry on October 20, 1969 after the debtor had requested that Mr. Bye draft the documents for the trust and the transfer to Mr. Lowry as trustee. Accordingly, it is concluded that the Trusts No. 2 were created on October 20, 1969.

That same date is also concluded to be the date of the stock transfer. While the question of the value of the subject shares of stock of The Colorado Corporation has been deferred, for purposes of considering the remaining legal questions it is assumed that on October 20, 1969 the value of those shares was greater than the amount of the notes given by Trusts No. 2, thereby making the transaction subject to gift tax because the transfer was for less than fair and adequate consideration.

What remains, then, is whether the price redetermination provision of the sale agreement avoids the gift tax. The Government urges that such provisions are void because they are contrary to public policy and cites as precedent the decision in *Commissioner v. Proctor*, 142 F.2d 824 (4th Cir. 1944), *cert. denied*, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944). There an attempt to avoid a gift tax was made by the insertion of the following condition in a transfer agreement:

[I]n the event it should be determined by final judgment or order of a competent federal court of last resort that any part of the transfer in trust hereunder is subject to gift tax, it is agreed by all the parties hereto that in that event the excess property hereby transferred which is decreed by such court to be subject to gift tax, shall automatically be deemed not to be included in the conveyance in trust . . . . (p. 827)

The court ruled that the provision could have no validity because it would defeat final judgments of a court of law as well as inhibit the collection of a tax.

■ The ruling is not persuasive here because there is a substantial difference in the agreements. In *Proctor* the only apparent purpose of the quoted condition was to negate the transfer entirely if and when gift tax consequences were determined in litigation. In the present case there are proper purposes to be served by the provision for redetermination of price. There is an obvious uncertainty about the valuation of shares in a closely held corporation. That uncertainty is even more apparent for the stock of The Colorado Corporation because of the nature of that company and the assets it held. Additionally, the type of transaction involved with family members can be assumed to generate a tax inquiry. To deny any effect to such an attempt to avoid valuation disputes with Internal Revenue Service agents by removing the incentive to pursue such questions is not contrary to public policy in the absence of a showing of abuse. Upon the record made here, it is concluded that there was an intention to cause the trusts to pay full and fair consideration for the stock and to make an actual adjustment of the price paid upon the event of a determination by the Internal Revenue Service.

ISSUE NO. TWO: The Private Annuity Agreement

A gift tax has been assessed on the transfer from John M. King and Carylyn Becker King to the four Trusts No. 1 of five parcels of real estate, parallel partnership interests, oil and gas property interests, art work and home furnishings, made during 1970 and 1971. The debtor contends that these transfers were all made as of May 25, 1970 in exchange for an annual annuity payment obligation of the Trusts thereby making the transaction one for a valid and adequate consideration with no gift tax consequences.

In early May, 1970, John M. King was engaged in a frantic effort to gain control of IOS and he was in Geneva most of the time. The debtor was then also undergoing a personal liquidity crisis. He had several large loans secured by stock of King Resources Company and because the market value of that stock was declining, the lending banks were demanding more collateral. To obtain that additional collateral, John King went to his children's trusts.

The documentation of what then happened between the debtor and these trusts is both confusing and conflicting as shown in the following discussion of the exhibits received in evidence.

Exhibit R has two pages. The first page is headed "Annuity Agreement" and bears the signatures of Carylyn B. King and Timothy G. Lowry as trustees together with the signature of John M. King to show his acceptance and approval. The document is undated except that it recites that it is effective as of May 25, 1970. This document reads as follows:

"In consideration of the conveyance to The Carylyn Ann King Trust, The Sally Ann King Trust, The John M. King IV Trust and The Mark M. King Trust, of those certain real and personal properties attached as Schedule A hereto, the undersigned, as Trustees of the aforesaid named Trusts, hereby agree to pay to John M. King during his lifetime and then to Carylyn B. King, during her lifetime if she survives John M. King, each year during their respective lives an amount equal to $157,921.03. Upon the death of the last to die of John M. King and Carylyn B. King, all payments shall terminate.

The Trusts shall have the right to offset the annuity payments due hereunder against any payments which may be due and owing to the Trusts from John M. King to the extent that said annuity payment equals or exceeds the payment due the Trust, regardless of whether said payments arise from promissory note, open account, rent or other obligation.

Should any Court of competent jurisdiction or any other appropriate administrative agency subsequently determine that the appraisals relied upon in ascertaining the value of the properties conveyed were more or less than said values, appropriate adjustments in the annuity payments shall be made accordingly."

There is no schedule A attached to this exhibit. Exhibit U is a composite of several documents. Two of these documents are identical letters addressed to Mrs. Carylyn B. King and to John M. King, respectively, from Carylyn B. King and Timothy G. Lowry as Trustees of the four trusts. These letters state:

"This will confirm our agreement with respect to The John M. King IV Trust, The Carylyn Ann King Trust, The Mark M. King Trust and The Sally Ann King Trust as follows:

1. You have agreed to convey to said trusts in equal shares the following properties which have the following estimated fair market values:

(a) an undivided 50% in the King family residence, Cherry Hills Estates, Colorado $750,000.

(b) an undivided 50% in the King family residence at Vail, Colorado $75,000.00.

(c) an undivided 50% in the King family residence at Palm Springs, California $250,000.

(d) an undivided 50% in all furniture, furnishings, paintings, china, silver, bric-a-brac and like articles, and all equipment in or owned and used in connection with said residences $125,000.

2. The said trusts have agreed:

(a) to pay to you each year during your lifetime an amount equal to the total amount of the fair market value of the property stated above, divided by the estimated number of years of your remaining life.

(b) to give to you as collateral for the payment of our agreement _____ common shares of The Colorado Corporation, which shares you are authorized to pledge in such fashion as you deem proper, but if said collateral is foreclosed the obligation of the trusts to make further payments under this agreement shall cease.

(c) this agreement shall only be assignable to one or more member of your family. If any other assignment is made or attempted by you, or if said agreement is sought to be attached by creditors, the obligation to make further annuity shall cease and you and your assignees shall look only to the collateral for payment.

3. The trusts have agreed to sell to you and you have agreed to purchase _____ common shares of The Colorado Corporation at $7.00 per share to enable the trusts to make the initial payment to you. If this is in accordance with your understanding of our agreement, please accept a copy of this letter and it will service as a present binding agreement, with the understanding that more definitive documents will be prepared and executed to supplement and implement this agreement."

Also included in Exhibit U is a schedule of oil and gas properties which are interests of John M. King in the partnerships which parallel Imperial-American Resources Fund and Royal Resources Exploration Limited Partnerships. Also as part of this Exhibit are identical letters from Timothy G. Lowry and Carylyn B. King as trustees to The Colorado Corporation for John M. King and Carylyn B. King which read as follows:

"I hereby instruct you to issue, in the name of Carylyn B. King _____ shares of Colorado Corporation stock owned by the John M. King IV Trust, the Carylyn Ann King Trust, the Mark M. King Trust, and the Sally Ann King Trust, of whom I am trustee.

The above number of shares to be issued proportionately from each trust."

The property in Cherry Hills is the subject of a deed from the Kings to the Trusts No. 1 dated August 11, 1970 and recorded August 11, 1970. The property in Hawaii is in two parcels which are the subject of deeds from the Kings to these trusts dated September 2, 1970 and September 9, 1970 and recorded on September 4, 1970 and September 9, 1970. The property in Palm Springs, California, is the subject of a deed from the Kings to the trusts dated August 11, 1970 and recorded August 11, 1970. The property in Vail, Colorado, is the subject of a deed dated August 11, 1970 and recorded August 11, 1970. Exhibits V3 through V6 are identical lease agreements for each of these parcels of real property whereby Timothy G. Lowry and Carylyn B. King as trustees leased to John M. King and Carylyn B. King as tenants each of those properties for a term of 15 years commencing May 25, 1970 for stated rentals in annual installments. The leases are dated August 11, 1970 "effective as of May 25, 1970". The aggregate annual payment on these rentals is $84,000.00 per year. Exhibit S is an agreement between the tenants and trustees for the payment of certain personal property to complete furnishing of these residences by the tenants in lieu of the first years aggregate rental. That agreement is dated August 11, 1970. Also in evidence as Exhibit T is a bill of sale from John M. King and Carylyn B. King to Carylyn B. King and Timothy G. Lowry as trustees to cover furniture, art objects, antiques, guns, paintings etc. to implement the agreements of May 25, 1970. That bill of sale is dated December 7, 1970.

The trusts involved in these documents are the June, 1967 Trusts which have been referred to throughout as the Trusts No. 1. The foregoing documentation appears to support the debtor's contention that as of May 25, 1970 he and his wife entered into an agreement with the Trusts No. 1 whereby the residential property and the oil and gas interests were valued at $3,191,000.00 and transferred to those trusts in consideration of the trusts' agreement to pay a private annuity to John M. King for his life at the rate of $157,921.03 per year and then payable to Mrs. King upon the debtor's death.

Exhibit V9 was submitted as evidence of an additional transaction between the debtor and the Trusts No. 1 on May 25, 1970. That document is a note and security agreement whereby John King agrees to pay to Carylyn B. King and Timothy Lowry as trustees $4,392,750.00 with interest annually at 7½%. The note is a demand obligation and the security recited in the document is the pledge of the payments to be received by Mr. King from the Trusts No. 2 as the purchase price for the sale of The Colorado Corporation stock by Mr. King to Trusts No. 2 under the agreement dated "as of January 1, 1969" which is the sale discussed in Issue No. One above. Also pledged as collateral are the annuity payments from Trusts No. 1 under the agreements just described. The testimony was that this $4,392,750.00 note was given to evidence the obligation of John M. King for the purchase of 878,570 shares of Colorado Corporation stock valued at $5.00 per share from Trusts No. 1. The exhibit contains the following language:

"The principal of this note is subject to adjustment in the event any Court of competent jurisdiction or any appropriate administrative agency subsequently determines that the value of the stock sold in exchange for this note was more or less than $5.00 per share."

The evidence received also includes documents relating to a May 25, 1970 transaction between John M. King and the Trusts No. 2. Exhibit Q–2 is a purchase and sale agreement whereby Mr. King agrees to buy 250,000 shares of The Colorado Corporation common stock for $5.00 per share payable not later than May 25, 1971. That agreement bears the signatures of John M. King as buyer together with Carylyn B. King and Timothy G. Lowry, trustees as sellers, and it recites that it is executed "as of May 25, 1970". It contains the same language just quoted from the note and security agreement with Trusts No. 1, with reference to redetermination of fair market value of the stock. Exhibit Q–3 is an undated letter

from John M. King to the Trusts No. 2 referring to the sale to him by those trusts of 250,000 shares of The Colorado Corporation stock and agreeing to release the pledge of the stock on the indebtedness owing to him under the "agreement of January 1, 1969". Thus the stock sold to Mr. King in this transaction is a part of that which the Trusts No. 2 acquired in the transactions described under the first issue in this litigation.

These documents were prepared after May 25, 1970 and they were the result of a number of discussions among counsel for Mr. King and for the trusts. Mr. Bye testified that he was in Geneva on King and IOS matters in May, 1970, when he was called by another attorney in his law firm who informed him that either Mr. Coffey or Mr. Lowry had said there was an agreement to transfer assets to the children's trusts to obtain The Colorado Corporation stock. Mr. Bye further said that when he returned to Denver in June, 1970, he saw a document dealing with a transfer of such stock in exchange for an annuity, and he said he objected to that approach because it involved the pledge of The Colorado Corporation stock to secure the annuity payment resulting in such control by John King as to give rise to a grantor trust with Mr. King incurring liability for the income tax on the trusts' income. Mr. Bye suggested that it would be far better for Mr. King to have a straight purchase of The Colorado Corporation stock. Mr. Coffey and Mr. Lowry objected to that approach because that would make the trusts liable for a capital gains tax in such an amount as would require the liquidation of trust assets to pay that tax. Both Mr. Lowry and Mr. Coffey did testify in this litigation and each did express that concern about capital gains tax liability.

The testimony of these three witnesses would suggest that the final documentation would have been a combination of the transfer of real estate and partnership interests, the annuity agreement and a stock purchase agreement.

Mr. Lloyd Wade, an attorney employed by King Resources Company was appointed trustee of the Trusts No. 1 in October, 1970. He reviewed these documents and met with the other trustees in November, 1970. Their purpose was to clarify the conflicts in the documents and the result of the meeting was that Mr. Wade drafted what has been received in evidence as Exhibit V. That is headed "Memorandum of Understanding and Agreement" and it is signed by Timothy Lowry, Lloyd Wade, Carylyn B. King, all as trustees and by John M. King and Carylyn B. King, individually. The exhibit recites that the parties wish to confirm and agree that the trusts entered into and consummated in May, 1970 the following transactions. First, that there was conveyed to the trusts real and personal properties in exchange for an annual annuity to be computed on the fair market value of the real estate by Arthur Andersen & Co. based upon appraised values. Second, that the annual annuity payments would be contingent upon receipt by the trustees of money due and owing to the trusts by John M. King. Specifically, if John King defaults in any of his payments the trusts would have the right to offset the annuity payments.

Additionally, the trusts acknowledged the sale to John King of 878,570 Colorado Corporation shares at a price of $5.00 as their fair market value on May 25, 1970 and that the purchase price is to be credited with $400,000.00 represented by a with recourse assignment to the trusts of a promissory note made by Lakeshore Associates dated January 2, 1970 with the balance evidenced by a promissory note from John M. King. The following paragraph is then in Exhibit V:

"Should any court of competent jurisdiction or any appropriate administrative agency subsequently determine that the value of the stock sold or value of the properties exchanged for the annuity payments was more or less than the value established under this Memorandum, appropriate adjustments shall be made to the promissory note or annuity contract to reflect the effect of any such revaluation."

It is the acknowledged right to offset payments which provides significance to the way in which these transactions were ultimately structured in the final documentation. The net effect is that John King was able to obtain the Colorado Corporation stock he desperately needed for collateral on his loans without any cash expenditure and the Trusts No. 1 were able to exchange their shares of Colorado Corporation for the real estate and oil and gas interests. Whether the trusts succeeded in avoiding capital gains tax liability in these transactions is not for this Court to decide in this case. All that is to be decided now is whether the gift tax assessment on the annuity transaction is valid.

The Kings never made any payments on the leases and in March or April of 1971 the trustees of Trusts No. 1 terminated those leases for non-payment of rentals. Mr. Wade explained that the trusts had limited cash available and were in the position of having to pay the expenses of these properties without income on them. Neither did John King make any payments on the note for the purchase price of the stock bought from Trusts No. 1. Likewise Trusts No. 1 have never made any payments on the annuity.

## CONCLUSIONS

■ The Government's contention is that the annuity agreement was, simply, a transfer of substantially all of the real and personal property of John M. King to the Trusts No. 1 for less than adequate and full consideration in money or monies worth. Such a transfer does constitute a gift under 26 U.S.C. § 2512 even without donative intent.

The evidence does show that Mr. Coffey met with Cal Bennett, a CPA with Arthur Andersen & Co., on July 20, 1970 to discuss the stock and the annuity transaction. Another meeting was held by Bennett with Lowry and the trustees in September and possibly October, 1970. At about that time Mr. King changed tax counsel from Mr. Bye to his present attorneys. These accountants recommended the annuity transaction and that it be structured in a way to avoid a gift. The amount of the annuity was to be based on the appraisal of the assets transferred.

With the exception of the house in Arapahoe County, the government has not really attacked the appraised values of these properties. Accordingly, the challenge to the annuity agreement is not that the property conveyed is unrelated to the amount of the annuity; it is that the promise to pay the annuity is not an adequate consideration. It is difficult, though, to separate the annuity transaction from the stock sale. Without the annuity, that sale would not be collateralized excepting for the notes receivable from the Trusts No. 2. Limiting this to the question of a gift tax and ignoring any income tax consequences to the arranging of the offsets, it must be concluded that this transaction did not give rise to the gift tax assessed on it.

■ There is nothing inherently suspect about the exchange of an annuity, and the practice has been affirmed in a number of cases. See, e. g., K. Bortman, 10 T.C. 1073 (1948); In re Myers, 27 TCM 975 (1968). See also Rev.Rul. 69–74, 1969–1 Cum.Bul. 43. In these cases, and the Revenue Ruling cited, a gift tax was assessed based on the inadequacy of the annuity; but the use of the annuity was not challenged. The above references are not authoritative, but as there are no cases which hold the sale of an annuity to be per se inadequate, the practice is permissible where the annuity is in fact fair consideration for the property transferred.

The Government relies on Updike v. United States, 88 F.2d 807 (8th Cir. 1937) in contending that the annuity cannot be viewed as consideration for the transfer. That reliance is misplaced. Updike dealt with estate taxes and a transfer in contemplation of death, not with the more narrow issue of the validity of an exchange involving an annuity. In Updike the question was whether the substance of the transaction constituted the retention of a life estate, not whether in any circumstances an annuity can be consideration.

*Greene v. United States*, 237 F.2d 848 (7th Cir. 1956) is equally inapplicable. The Court there held that where an annuity is to be paid from the income of transferred securities, the taxpayer has retained a life estate for purposes of determining the gross estate. That situation is far different from determining whether an annuity is adequate consideration for the remainder interest transferred. The question in estate tax cases is *what* in substance was transferred. In gift tax cases the question is *whatever* was transferred, was the consideration received fair. The debtor's situation is purely a gift tax consideration and estate tax cases are inapposite.

In the annuity agreement, the debtor provided for an independent and fair appraisal of the property, and for redetermination of the price if the amount of the annuity were found to be inadequate. For the purposes of this phase of the litigation, it is sufficient to find that the transaction as structured does not of itself incur gift tax liability. The value of the property and whether an annuity of $157,921.03 per year is large enough to constitute a fair exchange will have to be determined in Phase Three of this litigation.

In that regard, although the annuity agreement is dated as of May 25, 1970, the first evidence of the complete agreement is the series of deeds dated August 11, 1970. This is the proper date of the agreement, and the consideration for the sale should be determined in light of this date.

ISSUE NO. THREE: 1969 Deduction of Ordinary Loss for Abandonment of NOPI

In their joint income tax return for 1969 (Exhibit WW), John King and Carylyn King deducted as an ordinary business loss the amount of $4,543,822.00 for participation in co-owned oil and gas properties operated by The Colorado Corporation. That amount is based upon abandonment in the year of 1969 by The Colorado Corporation of oil and gas leases where John M. King owned a net operating profits interest. In making the assessments, IRS disallowed this deduction, contending that the transactions were without economic substance and constituted a sham designed to provide tax loss deductions.

In their agreements with their respective limited partnerships whose properties they managed, Imperial-American Management Company and Royal Resources Corporation earned participating interests in those properties called "Net Operating Profits Interests". By definition such interests entitled those companies to payment of 25% of the net income from producing oil and gas properties after the deduction of operating expenses but without deducting any drilling, acquisition or development costs. These companies were wholly owned subsidiaries of The Colorado Corporation, which, therefore, controlled the NOPI. It will be recalled that the funds were engaged in exploratory drilling operations with Royal Resources Funds being the wildcat or most speculative drilling company. Obviously, many of the properties drilled proved to be nonproductive and were abandoned.

Late in 1968 or early in 1969, Mr. Stanley Hallman, a CPA and tax specialist employed first by King Resources Company and later by The Colorado Corporation, discussed with John King the possibility of a sale by The Colorado Corporation of both producing and nonproducing NOPI interests. Mr. Hallman said in his opinion the purchaser of a producing NOPI interest would have income subject to depletion and the owner of a nonproducing interest could take an ordinary loss at the time of abandonment of the underlying property. The sale of NOPI would of course generate cash flow to The Colorado Corporation. Mr. Hallman pointed out to Mr. King that the percentage of dry holes to producing exploratory wells in Royal Resources would be fairly high so that a substantial write-off of the initial acquisition costs would be available to any purchaser of nonproducing NOPI.

In early January, 1969, John King flew to Acapulco and met with Edward Cowett of IOS. Mr. King advised Mr. Cowett that NOPI interests could be made available for

purchase by IOS principals. At that time, those principals in IOS who were American citizens were interested in obtaining "tax shelter" investments for two reasons. First, many of them were making very substantial commissions which would be ordinary income, and second, it was then expected that IOS would "go public" on both a new issue basis and a secondary distribution of outstanding shares. The shareholders of IOS would be required to dispose of 10% of their holdings each year for three years upon such a distribution. That requirement would necessitate substantial capital gains for those people and an extensive tax liability under the Internal Revenue Code.

In approaching Mr. Cowett and Mr. Cornfeld about this idea, Mr. King repeated his position that he, personally, would participate in any investments he recommended for them and they became attracted to the proposal.

Again, the documentation lagged.

In February, 1969, Mr. King advised Mr. Lowry that the IOS group had agreed to purchase approximately $20,000,000.00 in NOPI for each of three years, the NOPI to be in a mix of proven and wildcat properties. Mr. Lowry did not begin to draft documents on this subject until March, 1969. At that time he prepared Exhibit CC which consists of two agreements, each dated January 8, 1969, between The Colorado Corporation and John M. King. One agreement is for the purchase by John King of NOPI up to a total purchase price of $6,000,000.00 which NOPI is to be acquired upon the basis of tenders with ten days to reject each tender. The purchase price is to be settled before December 31, 1969 by payment of 25% in cash and 75% in negotiable notes with The Colorado Corporation retaining a security interest in the NOPI to collateralize the notes. The second agreement on the same basis is for the purchase of NOPI to a total of $250,000.00.

Exhibit DD is a similar agreement between The Colorado Corporation and Investors Overseas Bank Limited, for the purchase of $14,160,000.00 in NOPI in 1969.

That agreement is also dated January 8, 1969 and it is signed by Edward Cowett for the purchaser. Investors Overseas Bank Limited was an IOS affiliate. That bank entered into the purchase agreement as agent for individuals who were principals in the IOS organization.

Exhibit GG is a letter agreement, dated October 8, 1969, between The Colorado Corporation and Investors Overseas Bank, signed by Cowett, confirming an agreement for the bank to purchase, as agent, additional NOPI during 1970 and 1971 up to an aggregate purchase price each year of $15,-000,000.00.

The tenders made under these agreements consisted of oil and gas leases owned by the Royal and Imperial partnerships. Stanley Hallman and another employee prepared the tender letters from their review of these lease files and the tenders were made in the fall of 1969 because of a delay in the implementation of the agreements. The tenders were made on all of the leases committed to drilling programs, according to the testimony of Mr. Hallman. While Mr. King, did, of course, have access to these lease files and could, perhaps, have obtained advance information with respect to the properties subject to the tenders, there is no evidence that he did so. The evidence in this case is consistent with his contention that he purchased upon the same basis as the IOS people, and that he received the same treatment on the tenders as they did. Mr. King paid $1,500,000.00 cash as 25% of the $6,000,000.00 purchase by a check dated December 31, 1969. That $6,000,000.00 was to be the total of his purchase in 1969; but, a vice president of King Resources Company, Bennett King, unrelated to Mr. John King, had agreed to acquire $250,000.00 of NOPI, and he had asked to be released of that obligation. John King took up that obligation personally and paid $62,500.00 as 25% of it in April, 1970.

Mr. King did receive $140,202.00 in March, 1970 as his share of NOPI proceeds collected by The Colorado Corporation for him during 1969. Comparable cash pay-

ments were apparently made to the IOS investors.

Many of the leases underlying the NOPI transaction were abandoned and Exhibit KK is a notification to John King from The Colorado Corporation, dated March 20, 1970, advising him of the results of exploration activity on the leases in which he held NOPI as the result of this transaction. That exhibit is not sufficiently complete to show all of the abandonments used as the basis for the loss deduction taken in the 1969 income tax return.

By May, 1970, the IOS people had lost their enthusiasm for the NOPI purchase arrangements. By that time, the plan to take IOS public had been abandoned and the IOS empire was collapsing. Those factors combined to eliminate the need for a tax shelter investment and to cause a cash shortage with the persons who were to buy the NOPI. Accordingly, in June, 1970, a representative of those persons arrived in Denver to attempt to renegotiate this arrangement. The result of intensive negotiations was the formation of a new corporation called The NOPI Corporation to which the IOS people transferred all of their NOPI interest in exchange for a release of their future liability. A key bargaining point in those negotiations was the contention that Mr. Cowett did not have authority to bind the principals who were to be the purchasers.

Subsequently, in February, 1971, The Colorado Corporation repurchased all of the NOPI held by John M. King for a note in the amount of $1,400,000.00. At that time, both John M. King and The Colorado Corporation were in default on notes to Continental Illinois National Bank and Mr. King testified that the repurchase of the NOPI was designed to provide an opportunity to refinance The Colorado Corporation's obligations with that bank. The bank rejected such an offer to refinance.

The end result of the NOPI transaction, viewed retrospectively, is that John King paid out $1,562,500.00 and received $140,-000.00 income, making a net cash investment of $1,422,500.00. For that cash investment he received the tax benefit of a $4,500,000.00 deduction in his 1969 taxes. Additionally, he received a note for $1,400,-000.00 which was never collected by him.

Also a part of the repurchase by The Colorado Corporation of King's NOPI was the cancellation of the notes from King for the balance of the purchase price. The note to King for $1,400,000.00 and the reassignment are both dated December 31, 1970 and are in evidence as Exhibit 51 and 50, respectively.

## CONCLUSION

The Internal Revenue Service disallowed this deduction upon the conclusion that the NOPI purchase was a sham without economic substance. It is suggested that from the timing of the preparation of the tenders, which was within the last two months of 1969, and from the relationship of John King to The Colorado Corporation, the necessary inference is that the entire transaction was designed to obtain a tax loss and that the entire matter was controlled by the debtor. While these circumstances do promote suspicion, the Court must accept the uncontradicted testimony of Stanley Hallman as to the manner in which the selection was made and particularly that the tenders were prepared without knowledge of the results of drilling.

Counsel for the Government have cited a number of cases in which deductions were disallowed because the transactions were not entered into for profit. Those cases are not applicable to this situation because they do not involve the oil and gas industry. It is commonplace that in the exploration for oil and gas, more efforts are failures than successes. Accordingly, the statistics for dry holes are such that one is more likely to suffer a loss than a gain in any such transaction. Persons enter into such speculative investment because it does have the possibility of a high return when the efforts are successful and because under the present tax laws there are indeed benefits from failure. What must be said on this record is that while the probabilities favored losses and while it is clear that the parties acquir-

ing the NOPI were motivated by that feature, it was also possible for them to have had substantial revenue produced from these NOPI's. This is simply another circumstance in which persons who have sufficient tax flexibility to do so can take advantage of the law to enter into transactions in which they will benefit without regard for the economic success or failure of the investment. That is the heart of any tax shelter device and tax shelters are not, per se, unlawful. Upon this record, the taxpayer has met the burden and the deduction should be allowed.

It should also be observed that the transaction cannot fairly be viewed from hindsight. In 1969 it did appear that there would be a merger of King Resources Company and The Colorado Corporation and as has been suggested in the Government's brief, it would have been advisable to increase the value of The Colorado Corporation's assets by the sale of NOPI before that merger. By the end of 1970 it was clear that no such merger would take place and the reacquisition of NOPI could well be in the best interests of The Colorado Corporation at that time.

Finally, it should be noted that there were two individuals within the King complex of companies who also participated in the NOPI purchase but who asked for and obtained from John King "put" letters whereby Mr. King offered to repurchase from them the NOPI which they acquired on the basis of their investment less any return which they had received by revenue or tax benefit. I find no significance to those "puts" because that is entirely consistent with Mr. King's methods of persuading investors to enter into transactions and those "puts" were never exercised insofar as the evidence in this case has disclosed.

■ Deductions for worthless oil and gas leases are not new or unique aspects of oil and gas taxation. *See, e. g., Henley v. United States*, 396 F.2d 956, 184 Ct.Cl. 315 (1968); *C. C. Harmon*, 1 T.C. 40 (1942), *aff'd on other grounds, Commissioner v. Harmon*, 139 F.2d 211 (10th Cir. 1943), *rev'd on other grounds* 323 U.S. 44, 65 S.Ct. 103, 89 L.Ed.

60 (1944); *Pool v. United States*, 119 F.Supp. 202, 127 Ct.Cl. 549 (1954); 5 *Mertens, Law of Federal Taxation* § 28.20. The only material issues are the worthlessness of the interest, the intent to abandon, and the year in which the interest was abandoned. As stated in *Henley, supra*, at 962:

> "It is the practical worthlessness of the mineral interest . . . not the bare possibility of what might happen at some uncertain time in the future . . . ."

The only evidence of worthlessness presented in the present record is the schedule of income and loss sent to the debtor by letter of March 20, 1970 from The Colorado Corporation, and the Form 927's submitted to substantiate that loss. It should be noted that some of the properties conveyed by tender letters do not appear on the schedule and roughly one half of the losses claimed in the schedule are not documented by Form 927's. The failure to document these losses is not fatal to this part of the case as the proper amount of the loss may be determined in Phase Three. What is determined is that in those instances where Form 927's have been provided, debtor has met his burden of proving worthlessness, and the NOPI transaction as structured here qualifies for a deduction under I.R.C. § 165(c)(2). The only differences between this transaction and those which have been granted deductions in the past, are the name for the interest and the size of the losses generated. This is not enough to deny the deduction.

ISSUE NO. FOUR: Gift tax on Transfer of Furnishings and Artwork To Trusts No. 1

The personal books and records of John M. King reflect that during 1970 furnishings and artwork of the value of $26,213.20 were transferred to children's Trusts No. 1. A gift tax assessment was made on those transfers because there was no showing of their adequate consideration. The debtor contends that the transfers were made in payment of rent due and owing pursuant to the lease agreement of August 11, 1970.

■ Little was revealed in the record on this issue. Lloyd Wade testified that no

payments of rent were received by the trusts. On this issue the debtor has failed to meet his burden of proof to show that the transfers were accepted as part payment on the rental obligations as well as showing that these lease agreements were effective. Because these transfers cannot be otherwise characterized from the limited evidence available on the point, it is concluded that there was a proper assessment of gift tax on these transfers.

### ISSUE NO. FIVE: Gift Tax on 9,450 Shares of King Resources Company Stock

In 1970, Dempsey-Tegler, the firm which had been the underwriter when King Resources Company went public was in financial trouble because of the declining stock market at that time. At that firm's request, John King agreed that he and his family would place stock of King Resources Company with Dempsey-Tegler as subordinated capital which could be used in improving that firm's net ratios.

At that time there was a discrepancy among the debtor's four children in the ownership of shares of King Resources Company. The youngest child, Sally Ann King, had 9,450 shares less than the older three children. That was because the stock which was available to transfer to her was "lettered" stock available only for investment and therefore could not be used in the Dempsey-Tegler transaction. To equalize whatever benefit would result to the children from this transaction, Mr. King placed 9,450 shares of his stock with Dempsey-Tegler with the benefit to go to his daughter Sally.

While it is clear that Mr. King intended to give Sally these shares when they were free from the investment letter restriction, the record does not show any such transfer. The record also does not reveal what, if any, proceeds or other benefit were obtained from the Dempsey-Tegler transaction. To the extent that there were such benefits resulting from the use of this 9,450 shares, that would be the gift made by the debtor.

### CONCLUSION

The assessment made for gift tax on this transaction is limited to the amount of proceeds, if any, received by Sally Ann King from the use by Dempsey-Tegler of 9,450 shares of King Resources Company stock.

### FACTUAL CONTEXT FOR PHASE TWO ISSUES

In June, 1968, John M. King created a trust with Mercantile Bank and Trust Company, Freeport, Bahamas, as trustee and Mrs. King as beneficiary. Later, Mrs. King exercised a power of appointment to make their four children the beneficiaries of this trust which will be referred to as the King Bahamian Trust. The trust agreement (Exhibit II–N) was drafted by Mr. Bye and Mr. Lowry with the assistance of a lawyer in New York City, Joel Mallin. Mr. Mallin served as special tax counsel for IOS and its principals from time to time and he was also retained to do special tax work for Mr. King, King Resources Company and The Colorado Corporation on occasions.

The King Bahamian Trust was established with the transfer of $5,000.00. The trust agreement provided for the employment of an investment adviser and while there was no formalization of his role, Mr. Cowett acted in that capacity through an understanding with John King. While it is not clear how he was retained, Mr. Mallin apparently served as an attorney for the trust and he routinely received information and documents about trust affairs from the Mercantile Bank as trustee.

By the end of 1968 there were very substantial business relationships between the King complex and the IOS complex of companies and John King had also established personal relationships with Mr. Cornfeld and Mr. Cowett. The debtor was made aware of the IOS plan to make a public offering of its stock and he learned of the existence of a consent decree which prevented IOS from doing business in the United States. Under the terms of that decree, no American citizen could acquire more than 1% of the outstanding IOS stock which was then 6,000,000 shares.

John King wanted to obtain IOS stock before the public offering, anticipating a sharp rise in its value. At this same time Bernard Cornfeld wanted to reduce his holdings.

There was a preliminary agreement whereby Mr. King was to purchase 55,000 shares of IOS from Mr. Cornfeld. Before that transaction was completed some 40,000 shares of IOS stock became available as a result of a merger agreement between Lexington Research and Management Corporation and Piedmont Management Company, Inc. and the fact that IOS stock was not to be a part of the merged company's portfolio. It was decided that Mr. King would purchase those 40,000 shares and only 15,000 of Mr. Cornfeld's shares. There is dispute concerning the timing and the legal effect of the transactions and documents involved; but, all of these 55,000 shares eventually became the property of the King Bahamian Trust. That trust also acquired an additional 173,500 shares of IOS stock by purchases made through a broker, G. S. Herbert & Sons during September and October, 1969. The financing of those purchases is also in dispute.

The difficulties caused by a falling stock market, the resulting decline in the value of the securities owned by its mutual funds, the collapse of its sales program and the liquidity drain from increasing redemptions by fundholders produced a crisis in IOS in April, 1970. With the board of directors of IOS engaged in a continuous meeting from day to day, Edward Cowett and Joel Mallin came to John King to propose that he organize a consortium to provide financing and to take control of the IOS complex. They told the debtor that it was necessary to provide an immediate line of credit of $20,000,000.00 with another $20,000,000.00 to be made available later. It was suggested that King Resources Company could be the lead company in the takeover group.

The attitude and position of the Securities and Exchange Commission became a problem because of the existing consent decree. If King Resources Company took an "affiliate" position it could be considered to be in violation of that decree and the result could be a suspension of trading in all of the securities of all of the companies in the King complex. John King reacted quickly to what he perceived to be an enormous opportunity and he accepted the challenge.

He and Timothy Lowry went to Washington, D.C. on May 1, 1970 to inform S.E.C. staff members about this effort and believing that it would meet with approval, the debtor made immediate and most energetic efforts to obtain the required financing. Upon the advice of Edward Cowett that the IOS board of directors would not accept any takeover proposal until all outstanding loans from IOS affiliated banks to the King Bahamian Trust and a similar trust for the benefit of Mr. Cowett's family had been paid, Mr. King sent Mr. Lowry to New York City to arrange for a $10,000,000.00 loan package from Delafield Capital Corporation, a client of Mr. Mallin's law firm. What resulted is among the issues to be decided here.

Mr. King contacted various members of the board of directors of King Resources Company to assist in arranging the $40,000,000.00 in loans and he went to Geneva to put forth his proposals. By mid-May the money had not been obtained and it was then learned that there would not be S.E.C. approval. The result was the termination of what had been a frenzied effort.

In reaction to this country's deficit balance of payments position with foreign nations, Congress amended the Internal Revenue Code in 1964 to enact a new form of taxation called the Interest Equalization Tax, 26 U.S.C. § 4911 et seq. Under that legislation, a tax was imposed on the acquisition by a United States person of the stock of a foreign issuer or of a debt obligation of a foreign issuer. The tax on stock was set at 15% of its actual value, payable quarterly and the tax imposed on bonds or other debt obligations was set at lower rates graduated according to the maturity dates of such obligations.

Because the purpose of this tax was to reduce the outflow of funds from the Unit-

ed States through the sale of foreign securities in this country, an exemption was granted for the acquisition of foreign securities owned by another United States person. 26 U.S.C. § 4918. To establish conclusive proof of that exemption, provision was made for the issuance of a "validation certificate" by the treasury secretary or his designate under applicable regulations. It was required that an application for such a certificate must be made within thirty days after the purchase. This exemption section also provided that if the acquiring person could show a reasonable cause for his inability to establish the exemption under the certificate procedure, he could furnish other evidence to establish it to the satisfaction of the secretary or his delegate.

Section 4912 defined "acquisition" as:

"For purposes of this chapter, the term "acquisition" means any purchase, transfer, distribution, exchange, or other transaction by virtue of which ownership is obtained either directly or through a nominee, custodian, or agent . . ."

Under § 4912(b)(1)(A) any transfer, other than in a sale or exchange for full and adequate consideration, of either money or property to a foreign trust was deemed to be an acquisition by the person making that transfer if the trust acquired foreign stock or debt which would have been taxable to the transferor if acquired directly by him. The exact language of that section is:

"Any transfer (other than in a sale or exchange for full and adequate consideration) of money or other property to a foreign trust shall, if such trust acquires stock or debt obligations (of one or more foreign issuers or obligors) the direct acquisition of which by the transferor would be subject to the tax imposed by section 4911, be deemed an acquisition by the transferor (as of the time of such transfer) of stock of a foreign issuer in an amount equal to the actual value of the money or property transferred or, if less, the actual value of the stock or debt obligations so acquired by such trust. . . ."

An amendment to that section, effective as of June 9, 1969, established a presumption that whenever such a transfer was made it must be presumed with respect to the following calendar quarter that the foreign trust did acquire taxable stock or debt obligations in an amount equal to the value of the money or property transferred. That statutory presumption was made rebuttable by permitting the transferor to submit documents or other proof to establish that no liability had been incurred. It was required that such a submission must be made to the secretary or his delegate within thirty days after the close of the quarter. Section 4912(b)(1)(B).

ISSUE NO. ONE: Transfer of $5,000.00 to King Bahamian Trust

The debtor has conceded that the assessment of interest equalization tax on the original transfer of $5,000.00 to establish the King Bahamian Trust in 1968 is valid and he admits his obligation to pay that tax.

ISSUE NO. TWO: 40,000 Shares of IOS Stock

In this case, IRS imposed interest equalization tax on the acquisition of the 40,000 shares of IOS stock from Lexington-Piedmont by John M. King in March, 1969 because he failed to file an application for a validation certificate within the 30 day time limit. While it is conceded that there was, in fact, such prior American ownership of this stock as to make it exempt under § 4918 and that such a certificate would have issued if applied for, the Government contends that the prescribed certification procedure is the only way to avoid taxation and the time within which such application must be made has long since expired.

The debtor's expressed reason for the failure to apply for a validation certificate is that he was acting as an agent for the King Bahamian Trust in this transaction and that he never obtained the shares himself. If that were true, this would be a purchase by a foreign trust and not a United States person and there would be no tax.

The resolution of this issue requires a detailed examination of the evidence presented relative to this transaction.

Exhibit II–5, dated November 22, 1968, is a "stock purchase agreement" for the purchase by John M. King of 40,000 IOS shares from the Lexington-Piedmont companies for a total price of $1,105,000.00. Joel Mallin represented John King in this transaction and it was he who drafted that letter agreement. He was also attorney for the King Bahamian Trust at that time. Mr. Mallin obtained stock certificate number MU 1059 for these 40,000 shares with a blank stock power attached. He did not send that certificate forward to the stock transfer agent, Montreal Trust Company, until May 22, 1969 at which time he enclosed it with a letter instructing that agent to issue a new certificate in the name of the Mercantile Bank as trustee for the King Bahamian Trust. The new certificate, No. MU 1067 did issue in the name of that trustee and it was forwarded to the Bahamian bank in June, 1969.

In April, 1969, James Bye, as Mr. King's Denver attorney, was asked to review documents relating to this 40,000 share purchase with the request that he give suggestions or comments on what should be done with them. Mr. Bye was specific in his testimony that he gave his advice on April 16, 1969 and that is the date on a letter from him to Timothy Lowry enclosing a memorandum setting forth that advice and asking for Mr. Lowry's recommendation. (Exhibit II–12). In his memorandum, Mr. Bye recommended that Mr. King sell those shares to the King Bahamian Trust and he stated that such a sale had been suggested by Mr. Mallin. It was Mr. Bye's testimony that he was then informed that John King had intended at all times to act as agent for that trust so it was not necessary for any sale to be made. Acting on that information, Mr. Bye drafted Exhibit II–E which is a letter from John King to Mercantile Bank as trustee, dated May 9, 1969, confirming an oral understanding that he had acquired those 40,000 shares for the trust at a cost of $1,105,-000.00 which he advanced on March 20, 1969. The letter also expresses agreement that the trust will reimburse Mr. King in that amount plus interest at an annual rate of 4% on or before December 31, 1969. Mr. Bye also prepared Exhibit II–F, a note dated March 20, 1969 evidencing that obligation.

The validation certificate held by Lexington Management Company for these shares (Exhibit II–B) was sent to one of Mr. King's employees who asked for advice on it and Mr. Bye advised that no application need be filed because he had been told Mr. King was acting as agent for the foreign trust.

Internal Revenue Service assessed four different taxes on the dealings in these 40,000 shares. It has asserted John King's liability for interest equalization tax on the acquisition of the stock of a foreign company without obtaining a validation certificate. It contends that the debtor transferred this stock to the King Bahamian Trust in June, 1969 when the new certificate was sent to the Mercantile Bank which transfer was subject to interest equalization tax pursuant to the presumption in § 4912(b)(1)(B). It contends that this stock had substantially appreciated in value which would result in a gift tax based on the difference between the value of the stock in June, 1969 and the value of the note given in consideration for this transfer and it contends that to the extent of this appreciation in value of these shares there is a tax under 26 U.S.C. § 1491. That section provides for an excise tax on the transfer of stock or securities by a citizen or resident of the United States to a foreign trust at the rate of 27½% of the excess of the value of the stock or securities transferred over the adjusted basis of the transferor. In effect, this tax is a substitute for the income tax which the transferor would have had to pay on the gain realized if the transfer had been a sale or exchange.

## CONCLUSIONS

It was the debtor's burden to show by a preponderance of the evidence that he did act as agent in the acquisition of this

stock. He has failed to meet that burden. The contemporaneous documentation of the transaction with the seller is completely to the contrary and there is no objective corroboration of the debtor's testimony regarding his intention. If there was confusion among the attorneys acting in the matter as to what was the true purpose of the transaction, then the debtor must bear the burden of the consequences resulting from that confusion. Accordingly it is concluded that John King purchased these shares individually for $1,105,000.00.

To conclude that under these facts the failure to file an application for a validation certificate prohibits reliance on the prior American ownership exemption would be the kind of glorification of form over substance which government counsel have so sharply criticized in this litigation. The evidence in this case clearly establishes the exemption for this acquisition and it must be allowed.

These 40,000 shares of IOS were transferred to the King Bahamian Trust and it is now necessary to fix the time of that transfer to determine the applicability of the presumption created by § 4912(b)(1)(B). If it occurred after June 9, 1969, that presumption would apply and the debtor did not act to rebut it. Accordingly the tax assessment on this transfer would be proper. If the date of transfer is earlier, the evidence is not sufficient to show subsequent acquisition of foreign debt or securities by the trust from this source and the assessment would be invalid.

The fixing of a definite date for this transfer is also required for determining gift tax consequences. It is clear that the consideration for this transfer is a note from the trust to John M. King in the amount of $1,105,000.00 which is the same amount as his purchase price of $27.50 per share. If the stock increased in value, a gift tax is payable on the amount of that increase as of the date of transfer. The value on the date of transfer will also determine the tax under § 1491 which is simply a tax on the amount of the appreciation in value.

The issue is cloudy because of the conflicting role played by Joel Mallin. He purported to act as agent or attorney for both the debtor and the trust when he acquired physical possession of the old certificate no. MU 1059 in the name of Lexington-Piedmont together with the blank stock power on March 25, 1969. He held that certificate until May 22, 1969 when he sent it and the stock power to the transfer agent, Montreal Trust Company with instructions to issue a new certificate in the name of the Mercantile Bank and Trust Company as trustee. The new certificate, MU 1067 was issued on June 10, 1969.

To permit the legal status of these shares to be determined by the subjective intent of the custodian representing conflicting interests would be to promote uncertainty and after-the-fact redeterminations to inure to the benefit of those who permit such transactions. Fairness requires some objective manifestation of intention as to the capacity in which he held these shares and that first appears in the May 22, 1969 request for action by the transfer agent. To consider that as the earliest date the transfer took place is also consistent with the testimony and memorandum of Mr. Bye that it was in April, 1969 that he was asked to consider what disposition should be made of this stock acquired by Mr. King.

The government contends the transfer could not take place before June 10 when the new certificate issued because Mr. Mallin could have cancelled his instructions. That possibility did, indeed, exist, but there is nothing in evidence to suggest that the request was anything less than a definitive act to make the transfer and May 22, 1969 is fixed as the date of transfer for all types of taxes involved.

The result is that there is no interest equalization tax on this transfer because it is before the presumption date and there is no showing that this stock was used to acquire additional foreign securities.

Liability for gift tax and for the tax imposed by § 1491 depends upon the value

of these 40,000 shares on May 22, 1969 compared to the $1,105,000.00 purchase price. It was agreed that all questions of valuation would be deferred until Phase Three of this litigation.

### ISSUE NO. THREE: 15,000 Shares of IOS Stock

In December, 1968 John M. King purchased 15,000 shares of IOS stock from Bernard Cornfeld at a price of $27.50 per share for a total of $412,500.00. This stock was represented by certificate no. MU 1025 which was accompanied by a validation certificate for prior American ownership. A new validation certificate was obtained by Mr. King's application on May 14, 1969. (Exhibit II–GG).

Following an 8 for 1 split of IOS shares and the sale of ten per cent of this stock as required by the public offering in September, 1969, 108,000 shares were transferred on the books of the IOS transfer agent to the King Bahamian Trust on January 29, 1970. Using that as the date of a transfer and considering the transaction one between John King and the trust, IRS assessed interest equalization tax together with a gift tax and the transfer tax under § 1491 based upon the difference between the debtor's basis and the market value on January 29, 1970.

In August, 1969, John King addressed a memorandum to his attorney, James Bye, complaining that the 15,000 shares remained in Mr. King's name and that there had been a failure to follow earlier instructions to make these shares the subject of option agreements in favor of A. Rowland Boucher, James D. Tocher and E. Keene Wolcott, executives in the King companies. Mr. Bye responded to this memorandum by preparing option agreements in September, 1969. These options were, in turn, assigned to the King Bahamian Trust at the direction of John King. Apparently, the original option holders did receive cash benefits from the transaction but it is clear that they never had any actual power of disposition of these shares.

### CONCLUSION

■ Despite the elaborate documentation of these option agreements and assignment, the essential elements supporting the tax assessments are present in the evidence. John King did acquire this stock in his own name. That acquisition was not taxable because there was a validation of prior American ownership for it. Mr. King continued to control this stock and he directed disposition to the King Bahamian Trust. The difficulty in fixing a definite date for the transfer arises from a use of the option documents. The earliest date possible would be September, 1969, when these option papers were first prepared by Mr. Bye. The latest would be the date of the entry on the transfer agent's records. The Court has not been made aware of what difference would result from the selection of either date because the value of the stock on these dates is not in evidence. Because the confusion results from the choice of the debtor in making the documentation complex, it is fair and reasonable to draw the inferences against him and to select the later date. Accordingly, January 29, 1970 is fixed as the date on which John M. King transferred these shares to the King Bahamian Trust. Because this transfer is after the June 9, 1969 date, the presumption created by § 4912(b)(1)(B) is applicable and the debtor has not done anything to rebut that presumption that the shares were used to acquire foreign securities which would have been taxable if acquired by him. Interest equalization tax is therefore due for this transfer. The amount of any gift tax and any § 1491 tax cannot now be determined because there is no evidence of the value of the stock on the date of transfer.

### ISSUE NO. FOUR: The Delafield Capital Transactions

As earlier noted, the necessary condition precedent to making an offer to obtain control of IOS was the payment of the outstanding loans from IOS affiliate banks to the King Bahamian Trust and to the Edward Cowett family trust in the Bahamas. The purpose of the transactions with Delafield Capital Corporation was to obtain

the $10,000,000.00 required for such loan repayments.

Again the documentation is confusing. In these arrangements and in the execution of the papers, Timothy Lowry was acting under general powers of attorney given to him by John M. King, King Resources Company and The Colorado Corporation. Additionally he acted as trustee of the domestic trusts for the King children. Mr. Mallin's firm represented Delafield Capital Corporation and Mr. Mallin represented the King Bahamian Trust. The papers were prepared in great haste because of the urgency involved in preparing the presentation of the takeover offer to the IOS board in Geneva.

Exhibit II–64 recites that it is an agreement by Delafield Capital Corporation to loan $10,000,000.00 to Mercantile Bank and Trust Company Ltd. as trustee for the John M. King Trusts upon the following terms and conditions:

1. John King will furnish or cause to be furnished $5,000,000.00 to Delafield.

2. Mercantile Bank & Trust Company agrees to loan $1,000,000.00 to John M. King.

3. Edward Cowett agrees to furnish $2,000,000.00 to Delafield.

4. This money is to serve as cash collateral for the loan and upon receipt of that $8,000,000.00 together with the stock collateral, Delafield agrees to loan to John King $2,000,000.00 to make a total of $10,000,000.00 for the loan to the King Bahamian Trust.

The additional collateral under the agreement consists of shares of IOS Ltd. and IOS Management Ltd. held by the Mercantile Bank as trustee. The King children's domestic trusts are to put up 2,750,000 shares of the stock of The Colorado Corporation and John King is to pledge 286,000 shares of King Resources Company stock. There is also to be an undertaking by King Resources Company to register that stock with the S.E.C. as promptly as possible and Delafield has the right to put to John King The Colorado Corporation stock for $10,000,000.00 which put is to be guaranteed by The Colorado Corporation. Additionally, the Cowett Trust and Cowett are to put up shares of IOS as collateral. The total loan to the trust is evidenced by three notes of the trustee in the amounts of $7,000,000.00, $2,000,000.00 and $1,000,000.00 due on demand within ten days from the date of the loan.

For this loan Delafield is to receive a fee of $40,000.00 and will receive interest from the John M. King Trust on the $10,000,000.00 at 11% per annum. The exhibit also refers to John King's agreement to pay interest of 12½% per annum on the $2,000,000.00 Delafield is to loan to him for the cash collateral on the trust loan.

Exhibit II–61 is an agreement signed by Timothy Lowry as attorney-in-fact for King Resources Company to register the King Resources Company stock pledged by John M. King on the loan from Delafield to King of $2,000,000.00. Exhibit II–70 is a promissory note from Lowry as attorney-in-fact for John King to Delafield for $2,000,000.00 payable on demand.

Exhibit II–71 is a promissory note from Lowry as attorney-in-fact for John King to Mercantile Bank in the amount of $1,000,000.00 to evidence an obligation to repay a loan of $1,000,000.00 from that bank to Mr. King.

It was intended that the Delafield Capital arrangement be very short term financing for the approximately ten days thought to be all that would be needed to find the longer term loans to be used to solve the IOS liquidity problems. The business of Delafield Capital Corporation was private placement financing and it was expected that it would play a role in obtaining the $40,000,000.00 package. Delafield Capital did disburse $10,000,000.00 to Overseas Development Bank which did satisfy debts due to that bank by the King and Cowett trusts in the approximate amounts of $7,000,000.00 and $3,000,000.00, respectively. It obtained $5,000,000.00 of that money through King Resources Company and $1,000,000.00 of it came from the Mercantile Bank & Trust Company of the Bahamas as

the proceeds of that bank's personal loan to John King. $2,000,000.00 was advanced from Delafield funds on the loan to John King personally. Mr. Cowett was to provide the remaining $2,000,000.00 but he failed to produce any more than $400,000.00. To meet that deficit, the Mercantile Bank provided another $600,000.00 and the final $1,000,000.00 was obtained by Delafield from sources not clearly identified in this record.

With the failure of the long term financing and takeover effort the Delafield agreements went into default. Apparently some repayment was made by King Resources Company and there was a liquidation of collateral.

## CONCLUSION

The debtor contends that he was acting for King Resources Company in the Delafield transaction as well as the IOS takeover effort. The evidence presented in this case does not support that contention.

■ The debtor also asserts that his participation in this transaction was to provide $3,000,000.00 as cash collateral together with a guarantee of the King Bahamian Trust to the extent of that amount plus the additional collateral in the form of the pledged stock of King Resources Company. Thus it is argued that he did not make a loan to a foreign trust.

From the evidence presented it is concluded that the substance of this transaction is that John M. King borrowed $1,000,000.00 from the Mercantile Bank and Trust Co., Ltd., Freeport, Bahamas, and that he borrowed $2,000,000.00 from Delafield Capital Corporation. Mr. King then loaned $3,000,000.00 to the King Bahamian Trust which used that money to pay Overseas Development Bank for outstanding loans to that trust. The proceeds of those loans had been used to purchase IOS stock earlier and that stock had been pledged as collateral for the loans.

This loan of $3,000,000.00 was made in May, 1970. Even if the evidence were not clear that the loan was used to release IOS stock from the pledges to Overseas Development Bank, the loan is subject to the presumption under § 4912(b)(1)(B) and that presumption of use to acquire foreign stock has not been rebutted. Thus there is interest equalization tax liability for this $3,000,000.00 transfer.

Additional assessments were made for transfers to the King Bahamian Trust of $50,000.00 in May, 1970 and $47,500.00 in July, 1970. The evidence does not show these transfers and these assessments should be set aside.

ISSUE NO. FIVE: Acquisition of 173,500 Shares of IOS Stock by King Bahamian Trust

As previously noted the King Bahamian Trust acquired 173,500 shares of IOS stock through the brokerage firm of G. S. Herbert & Sons in September and October, 1969. John M. King transferred a total of $1,366,540.00 from his personal bank accounts in the United States to the trust to make some of these purchases. Another $1,163,035.50 was borrowed by the trust from an IOS affiliate bank. That borrowing appears to be a part of what was repaid in the Delafield transaction.

These 173,500 shares of stock were used by John King as collateral on a loan to him from Guiness-Mahon in England which loan went into default resulting in the sale of the shares by that lender.

The Internal Revenue Service assessed interest equalization tax on the entire purchase price of $2,526,575.50 apparently on the theory that Mr. King had borrowed from the foreign bank and loaned those proceeds to the trust.

## CONCLUSIONS

■ While it is conceded that the debtor did loan $1,366,540.00 to the King Bahamian Trust and that these proceeds were used to buy IOS stock, John M. King contends that there is no interest equalization tax because this loan was a transfer for full and adequate consideration within the meaning of § 4912(b)(1)(A). The premise of that argu-

ment is that the tax is only imposed on transfers for less than full and adequate consideration. That is not what the statutory language says. The adequacy of the consideration is relevant only where there is a sale or exchange. A transfer to a foreign trust which is not a sale or exchange is subject to this tax if the foreign trust acquires foreign stock or foreign debt obligations which would be subject to such a tax if acquired by the transferor. The obvious purpose of this provision is to prevent the use of a foreign trust to accomplish indirectly what could not be done directly without tax consequence.

There is no question but that Mr. King would have been required to pay interest equalization tax if he had directly purchased IOS stock with his $1,366,540.00. He has not escaped that tax by loaning the money to the Bahamian trust for its acquisition of the stock.

The debtor also contends that these advances constitute a loan which must be considered the acquisition by John King of a foreign debt obligation with a maturity date less than one year and therefore not taxable under § 4911. That is the section which sets the tax on the acquisition of foreign bonds or other forms of debts on a graduated scale according to maturity dates and such obligations are not taxed if the date of maturity is less than a year. § 4911(b)(2)(A). While the trust did incur an obligation to repay, the taxable transaction here is not John King's acquisition of that obligation; it is the transfer by way of the loan of funds to purchase the stock of a foreign company.

It is concluded that to the extent of the $1,366,540.00 the assessment for interest equalization tax is valid. The remainder of this assessment was based on the assumption that John King borrowed from the IOS affiliate bank for the balance of the funds necessary to purchase IOS shares. The evidence is that these were direct loans to the King Bahamian Trust and that portion of the assessment is therefore not supported in fact and must be considered invalid.

ISSUE NO. SIX: Foreign Withholding Tax

In his 1969 income tax return, John M. King took a deduction for the payment of $148,153.72 interest to Overseas Development Bank in that year. The government contends that he is liable for payment of a withholding tax on that amount under §§ 1441(a) and 1442(a) of the Internal Revenue Code. An assessment imposing that tax at a rate of 5% was included in the assessments made on May 31, 1971. Later, while this litigation was in progress, the Office of International Operations imposed an assessment of 30% on that transaction. The difference between the 5% and 30% is the question of the applicability of treaty arrangements which were recognized in the assessment but which were not honored by the Office of International Operations because of the defendant's failure to file a required form, Form 1042S.

What is shown in this record without dispute is that this payment to Overseas Development Bank was made by Banque Occidentale through arrangements made by Overseas Development Bank as an interim loan to get the King loan off of books of Overseas Development Bank. Accordingly, the transaction was never controlled by John M. King and such control of the loan payment is necessary for the obligation to withhold and pay withholding tax. Accordingly the assessments made locally and by the Office of International Operations for 1969 are without merit. The income tax deduction by the debtor may also be disallowed but that issue is not now present here.

Additional assessments were made for 1970 upon the assertion that there were other payments of interest to foreign banks in that year. The agent recommending the assessment was unable to identify documents or other bases for this determination, excepting for a vague reference to something showing in the books of account of John M. King. Since there was no showing of a basis in fact, the debtor was obviously unable to refute that assessment. An as-

sessment with no apparent basis in fact is not entitled to prima facie validity and it does not impose any burden of proof upon the taxpayer. Accordingly, there is no validity to the assessment for these withholding taxes in 1970.

 Additionally, the Office of International Operations made an assessment for 1970 based upon a payment from John M. King to Guiness-Mahon in the amount of $110,789.00, which was reflected on Form 1042 filed by Mr. King in 1971, as a late filing. There is no question but that interest paid to this English institution is exempt from the obligation to pay withholding tax because of a treaty between the United States and England. The assessment results only from a failure to file a form used to show the applicability of that treaty. That is another glorification of form over substance.

In his late filing for 1970 the debtor did report and pay $3,290.00 representing 10% of interest which he paid in that year to Banque Occidentale. The Office of International Operations assessed another 20% on those interest payments because the debtor did not file a form 1042S to support his position that the lower rate applied because of certain treaty provisions. The validity and applicability of that treaty cannot be determined on the present record because nothing about it was presented in the evidence. The mere failure to file a form should not be determinative of the question and if the parties cannot resolve it by agreement, this narrow issue must await determination in Phase Three of this litigation.

### CONCLUSION

The assessments for withholding tax for 1969 and 1970 are invalid except for the assessment of an additional 20% on interest payments to Banque Occidentale in 1970 which is not now determined.

Upon the foregoing, it is

ORDERED that counsel for the debtor and for the United States shall within twenty days from this date submit a written computation of taxes due based upon the findings of fact and conclusions of law made herein and that such computations shall include the contentions of the respective counsel as to the value of the stocks involved upon the dates of transfer as determined herein.