**In re King Resources Company Securities Litigation.**

**STATE OF OHIO, Plaintiff,**

v.

**CROFTERS, INCORPORATED, Dee Gee Company, a partnership, Sidney D. Griffith, Bernice S. Groban as Executrix of Harry A. Groban, Deceased, Gerald A. Donahue, King Resources Company, John M. King, William V. Coffey, the Colorado Corporation, Regency Income Corporation, Robert B. Crew, Jr., Elliot Keene Wolcott, Arthur Andersen & Company, a partnership, Dun & Bradstreet, Incorporated, Financial Data Relations, Incorporated, and Ronald R. Howard, Defendants.**

**Civ. A. No. C–4628, M.D.L. Docket No. MDL–79–1.**

United States District Court, D. Colorado.

May 23, 1977.

William J. Brown, Atty. Gen. of Ohio, Ronald B. Brown, Eugene F. McShane, Asst. Attys. Gen., Columbus, Ohio, J. Vernon Patrick, Jr., Michael L. Edwards, Richard North Patterson, Berkowitz, Lefkovits & Patrick, Birmingham, Ala., Harry L. Hobson, Luke J. Danielson, Holland & Hart, Denver, Colo., for plaintiff.

Jane E. Griffith, Executrix, Thomas E. Palmer, Gingery, Palmer & Kettewell, Columbus, Ohio, for Sidney D. Griffith.

Gerald A. Donahue, Columbus, Ohio, for Gerald A. Donahue.

John S. Pfeiffer, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for King Resources Co.

John M. King, pro se.

John J. Flynn, Jr., Timothy A. Correll, Inman, Flynn & Coffee, Denver, Colo., for the Colorado Corp.

William G. Sumners, Jr., Denver, Colo., for Regency Income Corp.

James H. Ledman, Columbus, Ohio, William P. Shannahan, Higgs, Fletcher & Mack, La Jolla, Cal., for Elliot Keene Wolcott.

H. Thomas Coghill, Paul E. Goodspeed, Coghill, Goodspeed & Roble, Denver, Colo., Charles W. Boand, Paul S. Gerding, Wilson & McIlvaine, Chicago, Ill., for Arthur Andersen & Co.

Bruce G. Lynn, Elbert J. Kram, Bricker, Evatt, Barton & Eckler, Columbus, Ohio, William G. Berge, Denver, Colo., for Dun & Bradstreet, Inc.

Ronald R. Howard, pro se.

SHERMAN G. FINESILVER, District Judge.

ORDER NO. 1977–14

## ORDER IMPOSING SANCTIONS AGAINST DEFENDANT ARTHUR ANDERSEN & COMPANY

Pursuant to Rule 37, Federal Rules of Civil Procedure, Plaintiff, State of Ohio, has moved the Court to impose sanctions against defendant Arthur Andersen & Company for failure to comply with discovery orders and reasonable requests of Ohio for discovery, including production of documents.

On April 17, 1972, Ohio filed this action in the United States District Court for the Southern District of Ohio against Andersen and others. Jurisdiction is based on § 22(a) of the Securities Act of 1933 as amended; 15 U.S.C. § 77v(a), and on § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. King Resources Company (KRC) is one of the defendants. The Judicial Panel on Multidistrict Litigation transferred the case to the District of Colorado for coordinated proceedings with other cases arising out of the affairs of KRC. *In re King Resources Company Securities Litigation*, 352 F.Supp. 975 (Jud.Pan.Mult.Lit.1972). Suit against King Resources Company has been stayed by an order in bankruptcy proceedings. Several of the numerous cases relating to King Resources are listed in the appendix.

Defendant Arthur Andersen & Co. (Andersen) is a national accounting firm with its principal office in Chicago, Illinois and having offices throughout the world.

The motion for sanctions arises out of defendant Andersen's response to discovery requests and its response to several court orders. The court orders involved were entered on December 16, 1975, May 27, 1976, July 2, 1976 and July 22 and 23, 1976.

A matter relating to discovery of documents was previously filed by Andersen in the Tenth Circuit Court of Appeals and rejected by that court. *Arthur Andersen & Co. v. Finesilver*, 546 F.2d 338 (10th Cir. 1976), *cert. denied*, 429 U.S 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977).

One of several hearings on sanctions was commenced on July 22, 1976. That hearing was held in abeyance pursuant to a stay order entered by the Court of Appeals in *Arthur Andersen & Co. v. Finesilver, supra.* A further hearing on sanctions was held on April 15, 1977.

Upon review of the totality of evidence, and briefs and statements of counsel we impose sanctions against Andersen. We find that the actions of Andersen were without good cause or substantial justification, have inordinately delayed resolution of this litigation, and have resulted in waste of time and unnecessary expense to the State of Ohio. In a flagrant and deliberate way Andersen has undermined the basic aim of the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action" brought before the federal courts. Fed.R.Civ.P. 1. Plaintiff is entitled to reimbursement for its reasonable expenses and attorneys' fees in connection with discovery and other relief as set forth below.

### CHRONOLOGY OF EVENTS

In April and May of 1972, the State of Ohio purchased two KRC notes in the total face amount of eight million dollars. Plaintiff alleges that in deciding whether to purchase the notes it relied upon certain KRC financial statements and opinions prepared by Andersen. The notes were not re-deemed at maturity because of the financial collapse of KRC.

In its complaint, Ohio contends that the financial statements and opinions released by Andersen were false and misleading. In particular, Ohio claims that Andersen's financial statements did not indicate the extent to which KRC was dependent upon a single customer, the Fund of Funds, Ltd. (FOF). FOF, it is alleged, accounted for 38% of KRC's gross profit in 1968 and 65% in 1969. FOF was a mutual fund controlled by Investors Overseas Services, Ltd. (IOS). Due to a series of questionable business practices both FOF and IOS were forbidden by the Securities and Exchange Commission from doing business in the United States. Plaintiff states that the SEC repeatedly announced that it opposed the development of ties between FOF, IOS and American corporations, specifically mentioning KRC.

While IOS was a Canadian corporation, its principal place of business was Geneva, Switzerland. Andersen provided various accounting services to FOF and IOS from its Geneva office. It was in the Geneva office that Andersen audited the books of FOF and IOS.

It is alleged that in the late 1960's KRC unsuccessfully attempted to take over FOF. The takeover activity resulted in a substantial cash drain from KRC and FOF. Ohio contends that it became quite likely that KRC would lose the business of its largest customer, but this fact was not noted in the KRC financial statements. Andersen denies any liability or wrongdoing in this suit. We note at the outset that Andersen's knowledge of the KRS–FOF–IOS connection is of obvious relevance and importance to the lawsuit.

Discovery has been extensive and has spanned the United States and foreign countries. On October 24, 1975, during the latter phase of discovery Ohio served Andersen with a request for production of:

Reports of examination, draft reports, working papers, workpapers, correspondence files and permanent files of Andersen relative to examination after January 1, 1967 of IOS.

On December 16, 1975, the court ruled that the request was meritorious and that Andersen should produce the requested documents from its files within the United States.

On April 15, 1976, plaintiff filed a "Motion to Compel Further and Complete Discovery Concerning I.O.S.". In the motion Ohio asked for production of documents in the Geneva, Switzerland office. Andersen opposed the Motion to Compel by stating, *inter alia,* that the Swiss Code of Obligations, the Swiss Penal Code and the Swiss Federal Banking Law all prohibited release of the documents to plaintiff. Andersen tendered an opinion of Swiss counsel, prepared at Andersen's request, to the effect that Andersen would be in violation of Swiss Criminal law if it revealed any documents in its Geneva file. Andersen flatly stated that if it "were ordered to produce documents or obtain data from its Geneva office, Andersen could not do so without subjecting its personnel to the penal and civil sanctions imposed by the laws of Switzerland". *Memorandum in Opposition to Plaintiff's Motion to Compel,* filed April 30, 1976 at 23.

Plaintiff, on May 24, 1976, tendered certified consents to disclosure of the IOS and FOF documents held in Geneva on May 24, 1976. The FOF consents were signed by all FOF directors, its president and secretary. The Canadian liquidator of FOF and IOS, appointed by the Supreme Court of Ontario, also signed consents to disclosure on behalf of FOF and IOS. On the day that the Ohio consents were filed with the court Andersen submitted a memorandum in which it denied that the consents were of any significance to the legal problems involved in disclosure of the Swiss documents. Andersen stated:

Ohio now puts forth a few purported waivers and consents. Initially, it is important to note that the court cannot give any weight to the consents Ohio has submitted because it is purely an unsupported assumption on Ohio's part that the consents have any binding effect whatever upon the entities involved. . . . Moreover, even if they were proper and binding, the purported waivers and partial waivers and consents relied upon by Ohio could not by any stretch of the imagination protect Andersen or its personnel against criminal and civil liability under the laws of Switzerland. A great many other consents would be required in view of the multifaceted and far flung operations of IOS and its 80 or more subsidiaries.

While we do not wish to go into extensive discussion of Andersen's statements at this point, it should be noted, and we find, that Andersen, by its later statements and conduct, proved each of the objections to be illusory.

We ruled on the Motion to Compel at our May 26, 1976 hearing.[1] There we observed that plaintiff had made a good showing for the need to discover the contents of the Geneva files and granted the Motion to Compel. Thereafter on June 17, 1976, Andersen filed a motion requesting the court to withdraw the discovery order alleging that Andersen was taken by surprise by the order directing discovery in Geneva. In its motion, Andersen again asserted that the waivers or consents to disclosure obtained by Ohio were "obviously inadequate to cover the broad discovery requests". In the same motion, however, Andersen stated that during the time between the filing of the consents by Ohio, and the May 27th ruling, it "did not have adequate time to determine the extent to which such limited consents might enable it to produce any of the documents".

Thus, between May 26, 1976, when we entered our order, and June 17, 1976, when Andersen filed its motion to stay, no serious attempts were made to comply with the court's order. It also became obvious as future events unfolded that despite 15 months of protestations from defendant Andersen, its American counsel had no clear understanding of the contents of the

---

1. Our bench order of May 26, 1976 was entered on the Court's Registry of Action on May 27, 1976. We shall refer to the order, as do the litigants, as the May 27th order.

Geneva files. Without such an understanding, the assertions of the illegality of production of any documents and the denial of the import of the consents obtained by Ohio revealed themselves as mere charades intended to prevent both Ohio and the court from approaching the discovery question in an informed and professional manner. The concession that Andersen had not examined its files upon receipt of the original request for production places in substantial doubt the credibility of both the written opinion of Swiss counsel and Andersen's own insistence that it had "proceeded in good faith to do the best it can". *Supp. Memorandum in Opposition to Plaintiff's Motion to Compel* at 4. Counsel for Andersen finally inspected the Geneva files between June 18 and June 25, 1976.

On June 25, 1976, we denied Andersen's Motion to Stay our May 27th order. In the June 25, 1976 order, we emphasized our concern that discovery had been inordinately delayed. We observed that professional cooperation among counsel would assist in the orderly progression of the lawsuit and that cooperation should be forthcoming. We directed a meeting between counsel to explore resolution of discovery matters. Prior to any meeting with plaintiff, Andersen filed a notice of appeal of our May 27, 1976 order.

As might be anticipated, the meeting between Ohio and Andersen was not fruitful. Ohio proposed that as to documents which Andersen claimed foreign law "privilege" Andersen "exert every effort" to obtain the required consents or waivers. As to those documents which could not be produced without Swiss law problems, Ohio proposed that Andersen list the documents and state with specificity the ground for non-production. Andersen refused to agree to this procedure. Instead, Andersen informed the court that it intended to follow its own procedures. *Report of Arthur Andersen & Co.,* filed July 1, 1976. Andersen's proposal was that its Swiss counsel would inform the court of what documents or portions of documents could be produced; that those documents would only be produced upon Ohio agreeing to a protective order acceptable to Andersen; and that for documents not produced, Andersen would list the reasons for non-production. Despite the similarity between the proposals, Andersen refused to include a provision that it would exert every effort to obtain the necessary consents.

On July 2, 1976, we withdrew our May 27, 1976 order. In its place, however, we adopted the Ohio formulation that Andersen exert every effort to obtain consents needed to produce the totality of the documents. We set a deadline of July 12, 1976 for production of documents. We also stated that the court would impose sanctions should it appear that claims of foreign law privilege were not made in good faith. Seven days later Andersen appealed the order to the Tenth Circuit of Appeals. Andersen also filed for a writ of mandamus.

Most revealing is the memorandum filed in this court in support of the motion to stay. There, Andersen stated that its search of the Geneva files identified approximately 220 documents which were responsive to Ohio's discovery request. Of the 220, Andersen had determined that the "responsive portions" of 190 documents could be produced without violating Swiss law as a result of *"certain consents recently furnished to [Andersen] by plaintiff".* (Emphasis added) It was further stated that the responsive portions of the 190 documents would be produced during the week of July 12, 1976.

The week of July 12, 1976 arrived and passed without production of a single document by Andersen.

A previously scheduled hearing was held on July 22, 1976. The original purpose of the hearing was the submission of a pretrial order.[2] The court's attention was soon drawn away from the consideration of the

2. A satisfactory pretrial order was not filed on that date, in part, because Andersen declined to stipulate to *any* facts as uncontroverted.

pretrial order and to various discovery disputes.[3]

On July 13, 1976, plaintiff had filed a motion for sanctions. It became obvious that the court would consider the Geneva documents question at the pretrial conference. Two days before the conference Andersen filed two memoranda in opposition to the imposition of sanctions. In one, Andersen unequivocally stated *"Prior to the service of Ohio's motion* (for sanctions), the responsive portions of all those documents, and the answers to interrogatories, *had been tendered to Ohio"*. (Emphasis in original). Andersen also accused Ohio of bad faith, saying:

> Indeed, as Ohio is aware—although for its own purposes, it has chosen to inform this court of the fact in only the most elliptical terms—Andersen *has produced* for Ohio's inspection a substantial portion of the documents in question. Further, by virtue of its most recent efforts to finally resolve this discovery dispute . . . Andersen will have produced *all* the documents relating to (the issue). The net result: there are no such documents left for this court to compel Andersen to discover; there is no non-compliance to serve as a predicate for sanctions. (Emphasis in original).

In fact, however, as of the date of filing the memoranda, Andersen had not produced a single document from its Geneva file. What Andersen had done was to inform Ohio by letter that if the court entered a protective order acceptable to Andersen, it would make available only the responsive portions of relevant documents. Further, Andersen stated that "production" would be made only at the Geneva office.

On the morning of the pretrial conference Andersen finally delivered some "documents" to counsel for Ohio. This was the first time since the request for production had been served on Andersen on October 24, 1975, that anything from the Geneva office had been submitted to Ohio. At the hearing dealing with sanctions on July 22, 1976, Andersen represented to the court that it had provided Ohio with 84 of the 220 responsive documents.

What was the nature of these documents which might subject Andersen and its European employees to severe civil and criminal liability? What was the nature of these documents which Andersen had withheld for ten months because of the extensive consents need for production? The documents tendered to Ohio on the morning of July 22, 1976 included 84 newspaper clippings.[4] While Andersen delivered these clippings and other documents in July, they had been identified as responsive to the discovery request over a month earlier when one of Andersen's counsel went to Geneva to examine the files. Nonetheless, the documents were not turned over until July because instead of hand carrying the items on his return to the United States, counsel mailed the documents from Geneva to Denver, which necessitated the further delay intrinsic in clearance with the United States Customs Office. This episode highlights Andersen's tenuous argument of "good faith" in expediting the discovery and is illustrative of its continued attempt to thwart timely discovery.

At the July 22 pretrial conference, Andersen admitted error in not producing any documents by the July 12, 1976 deadline. Asked by the court why had the documents been delivered in such a tardy fashion, counsel replied that he was not "focusing on delay" as an important consideration. This statement was made despite the fact that the timetable for discovery was of great importance to the court and a topic of con-

---

3. During this litigation there have been, and continue to be, a myriad of discovery matters which have required court intervention. Many of these disputes have been resolved favorably to Arthur Andersen & Company.

4. At our April 15, 1977 hearing on the motion for sanctions, counsel for Andersen told the court that the clippings had to be individually reviewed for writings or stray marks. A deposition of co-counsel, however, revealed that there was never any document by document review of newspaper clippings or interim financial statements.

cern at many of the court's hearings and in its written orders.

To move the case forward the court signed a protective order. Order No. 1976–12 (July 23, 1976). The order was not out of the ordinary. It merely stated that the use of any of the Geneva documents would be limited to the purposes of the immediate lawsuit. Upon request, the order could have been entered on October 1975.

The fact that Andersen was willing to produce only portions of relevant documents served as another impediment. Andersen, in consultation with its Swiss lawyer, assumed the role of self-appointed censor, editor and arbiter. It decided what documents (or portions thereof) would be needed by Ohio and produced only those portions. The stated reason was that by excising portions of the documents before production, Andersen would not need to acquire certain additional waivers or consents for disclosure.

The effect of this censorship on the discovery timetable can be seen by reviewing a typical example. Certain edited documents were delivered to Ohio in late July, 1976. In August, Ohio requested that the censored portions be supplied. Andersen was unable to then respond to this request because the necessary consents had not been obtained. On December 28, 1976, Andersen received the needed waiver—a signed consent from the Canadian counsel for the IOS court appointed liquidator. The complete copies of the documents, however, were not delivered to Ohio for another month.

What is curious about Andersen's four month attempt to obtain the needed IOS consent is that the party contacted was Canadian counsel for the IOS liquidator. Ohio had presented Andersen with the consent of the liquidator in May of 1976, at which time Andersen rejected any possibility that such a consent could be of any value.

Nearly a dozen of the documents eventually produced were obtained not from Switzerland, but from file copies maintained in the United States. In December of 1975 we ordered Andersen to delve into its U.S. files and produce copies of the Swiss documents which existed in this country. Although the court required prompt production, the documents were not delivered, at the earliest, until July of 1976. Additional documents trickled in from Chicago, Newark, New York and other offices—some as late as January, 1977. Such a dilatory response to our December 16, 1975 order hardly bespeaks of the good faith compliance which Andersen repeatedly asserts.

On December 1, 1976, the Tenth Circuit entered its opinion on the discovery matters on Andersen's appeal. *Arthur Andersen & Co. v. Finesilver, supra.* The court found the interlocutory appeal premature and that this court had not usurped its authority in entering the discovery orders. Thereafter, Andersen applied to the Court of Appeals for a stay order. The Court denied the stay, noting that the case had been filed in 1972, and that it was time the action moved forward. Andersen's petition for a writ of certiorari was denied by the United States Supreme Court. 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). Thereafter, we scheduled a hearing on plaintiff's motions for sanctions. That hearing was held on April 15, 1977, at which time both Ohio and Andersen were heard.

At the hearing we were informed by Ohio that Andersen had produced, only the day before, "several thousand pages of Andersen documents" which were the subject of a stipulation of discovery entered on January 5, 1976.[5]

At the hearing Andersen, through its counsel, made the surprising admission that production of the Geneva documents represented no great threat of Swiss criminal prosecution. The court was told that Andersen's Swiss counsel now believed that

---

**5.** These documents are believed by the court to be from a source other than the Geneva files. We comment only because their production at this date is indicative of Andersen's response to

the duties of good faith and cooperation imposed under the Federal Rules of Civil Procedure.

the waivers obtained were adequate protection against criminal prosecution and that Andersen was willing to take "the risk". In May of 1976, however, Andersen stated that the Swiss prosecutor would be *obliged* to begin criminal proceedings should Andersen reveal the contents of its Geneva files. Andersen now asserts its good faith in producing portions of 218 of 220 relevant documents by April 15, 1977. In contrast to this assertion, Andersen's year and a half delay in production bespeaks of a willful attempt to withhold production of producible documents. We find willful and flagrant bad faith and a callous disregard of counsel's responsibilities. Andersen could have complied easily and expeditiously to the discovery orders entered by the court and the reasonable discovery request of Ohio.

■ Discovery rules are designed to inform each party of the basis of his adversary's claim or defense and to provide access to all relevant information. C. Wright, *Handbook on the Law of Federal Courts* § 81 (3d ed. 1976). Andersen's conduct in this matter has been marked by delay, excuse, recalcitrance and indifference. It's defense of good faith and cooperation is ill-fitting.

■ In sum, we find that (a) the material sought by Ohio from Andersen was relevant to the issues in the suit; (b) Andersen had the ability to expeditiously comply with Ohio's discovery request; (c) a court order was entered directing Andersen to exert every effort to comply with the discovery requests; and (d) Andersen deliberately and willfully refused discovery for an unreasonable period of time without justification.

## SANCTIONS UNDER FEDERAL RULES OF CIVIL PROCEDURE

### I.

■ Rule 37 of the Federal Rules of Civil Procedure was developed to give trial courts the tools they needed to enforce discovery procedures. Discovery under the Rules are designed to proceed at the initiative of the parties and under their control. Generally, judicial management and involvement in the discovery process is not required unless one party challenges the activity of an adversary. The sanctions aspect of Rule 37 provides for alternative approaches by the court to ensure that the spirit and object of discovery under the rules are maintained.

Under the Rule, where the court has once established the right of the moving party to the information requested, disobedience of the court's order is punishable without further consideration of the objections presented. Fed.R.Civ.P. 37(b). The sanctions provided for in the Rule mirror the degrees of involvement of the trial court in the pretrial procedure. Where the parties seek a ruling on the disputed right to discovery, Rule 37(a) imposes no sanction unless the objection of the reluctant party is without substantial justification. In such a case, Rule 37(a)(4) provides for imposition of costs against the recusant. But where the right to discovery has once been established, and the request enforced by an order compelling discovery, disobedience is punishable by contempt, by dismissal or default judgment, by an order establishing the existence of certain facts alleged by the moving party, or by an order precluding the delinquent from supporting or opposing designated claims or defenses or prohibiting him from introducing designated matters into evidence. Fed.R.Civ.P. 37(b)(2).

Within these broad parameters, the particular sanction to be imposed is within the discretion of the trial court. Rule 37 offers little guidance. The enumerated sanctions of Rule 37(b) are not exclusive; the court may respond to non-compliance by issuing "such orders in regard to the failure as are just . . . ." Fed.R.Civ.P. 37(b)(2).

Without adequate sanctions the procedure for discovery would be ineffectual. *See* 8 C. Wright and A. Miller, *Federal Practice and Procedure,* § 2281 (1970); 4 Moore, *Federal Practice,* § 37.03; and Rosenberg, *Sanctions to Effectuate Pretrial Discovery,* 58 Columbia L.Rev. 480 (1958).

In the usual litigation, the court need not resort to Rule 37 because counsel recognize

their duty to permit discovery and, in a professional manner, regulate the progression of the lawsuit with minimal court intervention. Such self-regulation is needed if the Federal courts are to be a forum in which every litigant can receive close and careful scrutiny of his claim.

In the last several years the caseload pressure placed on the Federal courts has been tremendous. As social institutions lose their persuasive force, more reliance is placed on the legal system for resolution of disputes. *See* E. Schuyr, *Law and Society, a Sociological View* (1968); Selznick, *Legal Institutions and Social Controls,* 17 Vand.L. Rev. 83 (1963). As an example, in 1971 this district experienced 294 case filings per judge. That number increased in 1975 to 443, forty-one cases over the national figure for federal district courts. *Management Statistics for United States Courts* (1976). We cannot hope to give each litigant his due unless the courts can be aided by competent counsel acting in a professional manner.

Over a decade ago, an observation was made in *Shapiro v. Freeman,* 38 F.R.D. 308, 312 (S.D.N.Y.1965):

> The Federal Rules of Civil Procedure were designed as an affirmative aid to substantive justice, and those who choose to read them restrictively do so at their peril. It is time that (discovery) be conducted by members of the bar in a cooperative manner, in accordance with both the letter and spirit of the rules, without petty bickering and without intervention by busy courts with more important matters pressing for attention. It is clear to us that (counsel) has no conception of his obligation to observe the rules 'as an officer of the court' or otherwise. Rather, he appears to be bent on concealing vital facts, or, at best, waging a war of [justification for his conduct] . . .. As a result, the cooperative atmosphere envi-

saged by the federal rules has been poisoned by antagonism.[6]

▮ Cooperation among counsel is not only helpful, but required, and the court has the duty to ensure that such cooperation is forthcoming. *See, e. g., Berger v. Brannan,* 172 F.2d 241 (10th Cir. 1949).

## II.

▮ The necessary cooperation by Andersen envisioned by Rule 37 has not been present in this case. Documents were not disclosed in full. Attempts to obtain necessary consents began in earnest only in August of 1976, a full eleven months after the first notice was received from Switzerland that such consents would be required. Even as late as April 15, 1977, the date of the most recent court hearing, not all of the admittedly responsive documents have been produced. It is an understatement to say that this case has unduly and unnecessarily taxed the judicial time available to the court. Litigants in this and other cases had to be informed that their causes could not be considered in a timely fashion because of the commitments this court made in response to Andersen's recalcitrant discovery practices.

Delay in the administration of justice has long been the subject of criticism. In 1906 Dean Pound addressed the American Bar Association in his now classic essay, *The Causes of Popular Dissatisfaction with the Administration of Justice* :

> The idea that procedure must of necessity be wholly contentious disfigures our judicial administration at every point. . . It leads counsel to forget that they are officers of the courts and to deal with rules of law and procedures exactly as the professional football coach with the rules of the sport.

29 *Reports of the American Bar Association,* 395 (1906). *See also,* M. Pirsig, *Profes-*

---

**6.** Subsequent to our writing this opinion, the Tenth Circuit Court of Appeals affirmed a dismissal for failure to comply with discovery orders. The court stated: "The orders of the [trial] court must be followed, and the Federal Rules must be followed in order for the entire machinery to function at all." *Murphy v. Fatzer,* unpublished, No. 76–1265 (10th Cir. June 1, 1977). *See also, Stanley v. Continental Oil Co.,* 536 F.2d 914 (10th Cir. 1976) and *Glezos v. Blackett,* unpublished, No. 76–1225 (10th Cir. April 25, 1977).

*sional Responsibility,* 319 (1970). Conduct such as that displayed by counsel for Andersen cannot be tolerated if the judicial system is to continue to be a forum for expedient and fair resolution of controversy. We are not unmindful that at times trial strategy suggests that counsel fight his adversaries on every ground, even those that appear untenable. While such trial tactics may serve a purpose, trial tactics that hinder, delay and add to the cost of litigation should not determine an attorney's conduct. It is true that the Code of Professional Responsibility mandates that a lawyer must represent a client zealously. See *Canon* Seven. Nonetheless, counsel must also recognize that "respect for judicial rulings is essential to the proper administration of justice". Ethical Consideration 7–22. In this case, the ethical obligations of counsel appear to have taken a subservient position to tactical considerations.

In a sense, the instant motion for sanctions is not simply a proceeding between the State of Ohio on one hand and Arthur Andersen & Company on the other. There are other litigants in this case who have had (and continue) to bear the cost and aggravation of countless hearings and delays. In addition, resolution of problems in other cases was delayed because of Andersen's conduct here.

In observing the dilatory tactics pursued by Andersen, another factor has been of concern to this court. In this case Andersen's opponent is a State of the Union. Like Arthur Andersen & Company, Ohio's financial resources in prosecuting this lawsuit are, for practical purposes, inexhaustible. Had Andersen's opponent been less affluent, however, it is a foregone conclusion that discovery of the Geneva documents simply would not have been accomplished.

In response to our order Ohio has submitted a statement of costs relative to this discovery question.[7] The work accomplished, fees and miscellaneous expenses were itemized and are listed in the margin.[8] The fees and expenses incurred from October, 1975, when Ohio first served its request for production, to March 15, 1977, when its statement of expenses was filed, totals $59,949.

Andersen disputes any inclusion of expenditures made in connection with its appeals and petitions to the Court of Appeals and Supreme Court. We expressly find that plaintiff's expenses made in opposing those appeals and petitions are properly included in the award of expenses. Rule 37 mandates an award of expenses against a party who resists discovery unless it is determined that the failure was substantially unjustified. In this case the Court of Appeals ruled that the interlocutory appeals were not justified and dismissed those appeals. *Arthur Andersen & Co. v. Finesilver, supra.* Plaintiff was forced to oppose the interlocutory appeals to protect its discovery rights. Thus, these expenditures were necessarily made in pursuing plaintiff's discovery rights and are properly included in our award. In this instance, there are no other circumstances which would make an award of expenses unjust.

We are familiar with the extent and intensity to which this discovery issue has been litigated. We are also knowledgeable of the quality of legal services rendered by various counsel in this case. In light of our familiarity with this case and experience in awards of attorney fees in complex litigation (*e. g. In re King Resources Company*

7. Plaintiff's Consolidated Statement of Expenses Incurred in Attempting to Obtain Discovery from Defendant Andersen Pursuant to this Court's Orders, filed March 15, 1977. Plaintiff also filed statements relating to costs on February 24, 1977 and July 23, 1976.

8. Expenses incurred to July 23, 1976: Harry Hobson and Luke Danielson—$5,490; Miles Gersh—$10,970. Expenses incurred in connection with proceedings before the Tenth Circuit Court of Appeals: Luke Danielson—$3,360; Miles Gersh—$16,100; Harry Hobson—$6,930; Jane Talesnick—$707; Suzanne Queenan—$900. Expenses incurred in connection with proceedings before the United States Supreme Court: Luke Danielson—$1,600; Miles Gersh—$6,300; Harry Hobson—$3,150; Other associates and paralegals—$225; printing costs—$4,217. Total: $59,949.

*Securities Litigation,* 420 F.Supp. 610 (D.Colo.1976) and *Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597 (D.Colo.1974), we find the $59,949 to be a fair and reasonable expenditure. The reasonableness of the individual charges and fees is not contested by counsel for Andersen. Indeed, Andersen has represented that it expended over $71,-000 since July 22, 1976, in resisting our orders. *Memorandum in Response to Plaintiff's Consolidated Statement of Expenses* at 4, filed March 21, 1977. Counsel for Andersen confirmed this figure at the April 15, 1977 hearing.

The costs which have been attendant to the delay in this case would prevent most litigants from having access to those documents to which they are entitled under Rules of Civil Procedure. While it is apparent that disparity in financial resources distorts the truth-seeking function in our judicial system, the court should not encourage that disparity by inaction in the face of abuse. The facts of this case compel us to award the State of Ohio the sum of $59,949 and assess this amount against Arthur Andersen & Company to compensate for the reasonable expenses incurred by Ohio in pursuing its discovery request. This award is made on the basis of both Federal Rules of Civil Procedure 37(a) and 37(b). We find that Andersen has both withheld documents to which Ohio was entitled and willfully and consciously violated court production orders.

It should be noted that the assessment of expenses and fees is not made for Andersen's failure to produce documents when such production would subject it to potential Swiss civil or criminal prosecution. Rather, the assessment is made for Andersen's unjustifiable resistance and delay in adherence to our discovery orders, which as the passage of time has demonstrated, was totally unwarranted. *See Advisory Committee Note to 1967 Proposed Amendments to Rule* 37. We also assess expenses because of Andersen's unreasonable opposition to Ohio's discovery requests. It is apparent that had Andersen been more assiduous in its responsibility in discovery, the documents could have been surrendered

months if not years ago without any serious foreign law entanglements. Where as here we have found unjustifiable resistance and violation of court orders on discovery, Rule 37 leaves the court no choice but to impose costs and expenses.

In addition to reimbursement of expenses, Ohio has asked for the imposition of non-monetary sanctions. Specifically, we are requested to impose sanctions to the effect that the following facts shall be taken as established:

1. Both on and before April 10, 1970, Arthur Andersen & Co. possessed information relating to the financial condition and particularly the liquidity of FOF and subsidiaries which should have led Andersen to conclude that FOF and subsidiaries would imminently cease to purchase natural resource interests from KRC:

2. Both on and before April 24, 1970, Arthur Andersen & Co. knew that John M. King had committed KRC to provide financing to IOS and was negotiating an agreement to give KRC control of the operation of IOS.

Ohio also desires that the court assess a $100,000 fine against Andersen. *Plaintiff's Motion for Hearing,* filed January 19, 1977. Rule 37(b) permits the court to issue any sanction as is just for failure to comply with the court's order. In particular the rule permits the court to designate certain facts as established, refuse to allow the disobedient party to introduce designated matters into evidence, or the court may strike out pleadings or parts thereof. In addition, the court may impose the "ultimate sanction": entry of a default judgment against a disobedient defendant, or dismissal against a plaintiff.

■ Before imposing sanctions it must, of course, be established that Andersen was in possession, custody or control of the documents sought. *Norman v. Young,* 422 F.2d 470 (10th Cir. 1970). In this case, there is no viable question of possession, custody or control.

The "ultimate sanction" of default cannot be administered absent some showing of willful failure to disclose. *Societe Internationale v. Brownell,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); Note, *Standards for Imposition of Discovery Sanctions,* 27 Maine L.Rev. 247 (1975). Some courts have extended the willfulness criterion to any sanction under Rule 37(b). *Dorsey v. Academy Moving & Storage Co.,* 423 F.2d 858 (5th Cir. 1970); *Robison v. Transamerica Ins. Co.,* 368 F.2d 37 (10th Cir. 1966).[9] *And see* 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2289 (1970).

Although willfulness is not a prerequisite to every sanction under Rule 37, the Tenth Circuit standard for the determination of willful conduct was stated in *Robison, supra:* ". . . to be 'willful' the failure need not necessarily be accompanied by wrongful intent. It is sufficient if it is conscious or intentional, not accidental or involuntary . . .". 368 F.2d at 39. Here it can hardly be said that Andersen's unjustifiable resistance to discovery and the court's orders was the result of accident or involuntary action. The history of this case is replete with misrepresentations and contradictions by Andersen dealing with material discovery matters. These were not made by inadvertence on isolated occasions. Instead, Andersen repeatedly claimed that its allegations of the impossibility of compliance without Swiss law liability was the true state of affairs. While Andersen asserted good faith, it repeatedly distorted the true state of its inaction to the court.[10] Regardless of the necessity of a finding of willfulness, it is clearly present in this case.

Sanctions imposed after the fact are often interpreted as punishment for non-compliance and hence, are in the nature of contempt which requires a due process procedure somewhat different from the hearing afforded here. However, as noted by the Third Circuit:

Of course, all sanctions by their very nature involve an element of punishment. Their function is to encourage adherence to discovery procedures. Only where the sanction invoked is more stern than reasonably necessary does a denial of due process result.

*DiGregorio v. First Rediscount Corp.,* 506 F.2d 781, 789 (3d Cir. 1974). More recently the Supreme Court approved of the "ultimate sanction" of dismissal and noted that its punitive aspects were overridden by the curative effects:

. . . here as in other areas of the law, the most severe spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent. If the decision of the Court of Appeals [reversing the district court's dismissal] remained undisturbed in this case, it might well be that *these* respondents would faithfully comply with all future discovery orders entered by the District Court in this case. But other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts.

*National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2780–2781, 49 L.Ed.2d 747 (1976). (Emphasis in original).

We admonished Andersen to review the *National Hockey League* decision during our July, 1976 hearings. Unfortunately, Andersen seemed then, as before, more interested in delaying and resisting discovery than in complying in good faith with court orders.[11] It is inescapable that Andersen

9. *Robison* was decided before the 1970 amendments to Rule 37.

10. *E. g.,* see Andersen's representations made in opposition to Ohio's Motion for Sanctions discussed at Page 18, *supra.*

11. *E. g.,* see our discussion, *supra,* of Andersen's four month attempt to obtain waivers from the IOS liquidator. Andersen's prior inability to find an authorized person to sign a waiver was asserted despite the fact that Ohio had presented Andersen with the liquidator's consent in May, 1976.

has followed a willful, deliberate and flagrant scheme of delay and resistance in discovery matters. In light of the opportunities to provide discovery of relevant documents, Andersen's opposition can only be characterized as contumacious and unjustified.

The choice of particular sanctions is a matter addressed to the sound discretion of the court. *Mangano v. American Radiator & Std. Sanitary Corp.,* 438 F.2d 1187 (3d Cir. 1971). Within that discretion we utilize the formulation found in Rule 37(b)(2)(B). That section provides that the court may enter "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting [it] from introducing designated matters in evidence". Accordingly, we prohibit Arthur Andersen & Company from introducing any evidence concerning the information possessed by it relating to the financial condition of FOF which should have led it to conclude that FOF would cease to purchase natural resource interests from KRC. Further, we prohibit Andersen from introducing evidence concerning its knowledge that John M. King committed KRC to provide financing to IOS and was negotiating an agreement to give KRC control of IOS.·

It can reasonably be said that the material in the Geneva files would lead to information concerning these issues; it is to establish these issues that Ohio sought the documents; and thus, it is particularly appropriate to prohibit Andersen from introducing any evidence opposing those claims.

Such a sanction, in the context of this case, is clearly warranted. The court is given great flexibility in these matters and could simply have followed Ohio's suggestion and ruled certain issues as established. *Metropolitan Greetings, Inc. v. Michael McDonough, Inc.,* 60 F.R.D. 58 (E.D.Pa. 1973); *Krieger v. Texaco, Inc.,* 373 F.Supp. 108 (W.D.N.Y.1973). Or, under the facts we could have entered a default judgment. *Glezos v. Blackett,* unpublished, No. 76–1225 (10th Cir. Apr. 25, 1977); *Paine, Web-*ber, Jackson & Curtis, Inc. v. Inmobiliaria Melia,* 543 F.2d 3 (2d Cir. 1976); *Local Union No. 251 v. Town Line Sand & Gravel, Inc.,* 511 F.2d 1198 (1st Cir. 1975); *Henry v. Sneiders,* 490 F.2d 315 (9th Cir. 1973), *cert. denied,* 419 U.S. 832, 95 S.Ct. 55, 42 L.Ed.2d 57; *Trans-World Airlines, Inc. v. Hughes,* 449 F.2d 51 (2d Cir. 1971); *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577; *Norman v. Young,* 422 F.2d 470 (10th Cir. 1970).

Sanctions need not always, of course, redound to the direct detriment of the client only. The court has the authority to impose sanctions directly against counsel under Rule 37. Also, under 28 U.S.C. § 1927, the court has authority to tax costs against counsel personally. In addition to the usual costs involved, the court can impose as costs expenses normally paid by the United States. See *Harrell v. Joffrion,* 73 F.R.D. 267 (W.D.La.1976).

The sanctions imposed are reasonable, necessary and warranted. Anything less would be a mockery of professional responsibility and of the tenor and spirit of the Federal Rules of Procedure. A lesser penalty would give license to financially able litigants to use court proceedings to hinder and delay litigation to the detriment of the integrity of the instant suit and to the orderly progress of other litigation as well.

## ORDER

Defendant Arthur Andersen & Company is to pay to the State of Ohio, through its Colorado counsel, $59,949 as a reasonable reimbursement for costs and expenses. Such payment is to be made no later than June 20, 1977.

At the trial on the merits, defendant Arthur Andersen & Company shall not oppose or introduce any evidence opposing plaintiff State of Ohio's claims that:

1. Both on and before April 10, 1970, Arthur Andersen & Company possessed information relating to the financial condition and particularly the

liquidity of FOF and subsidiaries which should have led Andersen to conclude that FOF and subsidiaries would imminently cease to purchase natural resource interests from KRC;

2. Both on and before April 24, 1970, Arthur Andersen & Company knew that John M. King had committed KRC to provide financing to IOS and was negotiating an agreement to give KRC control of the operation of IOS.

This memorandum opinion and order constitute our findings of fact and conclusions of law.

### APPENDIX

The following is a partial listing of cases assigned to this Judge as part of the King Resources Company Securities Litigation:

*Dietrich v. King Resources Co.,* Civil No. C–3424; *Gross v. Blyth & Co.,* Civil No. C–3979; *Morrell v. King,* Civil No. C–3980; *Licker v. King Resources Co.,* Civil No. C–3981; *Hill v. Arthur Andersen & Co.,* Civil No. C–4485; *Pyle v. Arthur Andersen & Co.,* Civil No. C–4486; *State of Ohio v. Crofters, Inc.,* Civil No. C–4628; *State of Ohio v. Boucher,* Civil No. 75–F–573; *First National Bank v. King,* Civil No. C–5045; *Arthur Andersen & Co. v. Boucher,* Civil No. 74–F–18 (six cases are consolidated under this number); *Arthur Andersen & Co. v. Burke,* Civil No. 75–F–945; *Royal Resources Corp. v. American Employers' Ins. Co.,* Civil No. 74–F–1143; *Central National Bank v. King,* Civil No. C–5201; *Nelson v. King,* Civil No. 76–F–643; *State of Ohio v. Peterson,* Civil No. 76–F–992.

The litigation relating to King Resources Company has engendered the following published opinions:

*Arthur Andersen & Company v. Finesilver,* 546 F.2d 338 (10th Cir. 1976); *In the Matter of King,* 545 F.2d 700 (10th Cir. 1976); *American Employers Insurance Co. v. King Resources Co.,* 545 F.2d 1265 (10th Cir. 1976); *Bottger v. King Resources Co.,* 545 F.2d 1265 (10th Cir. 1976); *In the Matter of The Colorado Corp.,* 531 F.2d 463 (10th Cir. 1976); *In the Matter of King Resources Co.,* 528 F.2d 789 (10th Cir. 1976); *In re King Resources Co. Securities Litigation,* 525 F.2d 211 (10th Cir. 1975); *In re King v. Baer,* 482 F.2d 552 (10th Cir. 1973); *In re King Resources Co. Securities Litigation,* 420 F.Supp. 610 (D.Colo.1976); *In the Matter of King,* 424 F.Supp. 117 (D.Colo.1975); *S. E. C. v. Crofters,* 351 F.Supp. 236 (S.D. Ohio 1972); *In re King Resources Co. Securities Litigation,* 352 F.Supp. 975 (Jud.Pan. Mult.Lit.1972); *In re King Resources Co. Securities Litigation,* 352 F.Supp. 974 (Jud. Pan.Mult.Lit.1972); *In re King Resources Co. Securities Litigation,* 342 F.Supp. 1179 (Jud.Pan.Mult.Lit.1972). *American Employers' Ins. Co. v. King Resources Co.,* 556 F.2d 471 (10th Cir. 1977).